Filed 10/27/22  P. v. Fonseca CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>RENE FONSECA,<br><br>        Defendant and Appellant. | A159178<br><br>(San Francisco County<br>Super. Ct. No. SCN229876) |

Defendant Rene Fonseca was convicted by a San Francisco jury of five sex offenses, all but one of them felonies, after he had sex in the dead of night with his much younger, 20-year-old cousin as she lay in her bed so intoxicated she could barely stay conscious, while her younger brother lay awake within earshot in the bedroom next door and her parents had just gone to sleep downstairs.  The two had engaged in a night of heavy drinking and drug use together, bar-hopping after a San Francisco Giants baseball game until the early morning hours, before defendant escorted his inebriated younger cousin home to her parents' house around 2:15 a.m.  His principal arguments, rejected by the jury, were that the young woman was not so intoxicated that she lacked the legal capacity to consent to sex with the man she regarded as her "uncle" and that, even if she was too intoxicated to legally consent, his belief that she wasn't was reasonable.

1

Defendant raises numerous issues on appeal, including challenges to the jury instructions, a challenge to the admission of testimony by a rape trauma expert, a claim of newly discovered evidence that he says would have impeached the complaining witness about the extent of trauma she suffered, and a challenge to the removal of a juror who disagreed with the law of rape by intoxication and sexual battery, and said he could not abide by his oath to follow the law as stated in the instructions.

We find no prejudicial error and affirm the judgment.

## BACKGROUND

The complaining witness (E.L.) is related to defendant through her father, who is defendant's first cousin.[1] Defendant is about 10 years her elder, and she always referred to him as her uncle, or "tio." They did not grow up together and saw each other infrequently, only at family gatherings a couple of times a year.

At the time of the events in question, defendant had recently graduated from medical school and was looking ahead to start a career in medicine. E.L. was 20 years old and on summer break after her sophomore year of college, living at home in San Francisco with her parents and her younger brother who then was around 17 years old.

E.L., by her own account, had a "pretty high" tolerance for alcohol. Unbeknownst to her parents, she had begun occasionally drinking in high school and in college she drank frequently. She estimated she had blacked out from drinking around five times in the past (and at the preliminary

---

[1] The parties referred to her below as defendant's "second cousin," although technically she is defendant's first cousin once removed. For purposes here, we refer to her as his "cousin."

2

hearing, put the figure at five to ten times), and testified it would take five or six drinks before she felt drunk.  She had a fake ID to get into bars with her friends, and also had previously used both marijuana and cocaine.  Her parents knew none of this, and until the night in question had never even seen their daughter inebriated.

### A.    The First Bar

On the night in question (July 13, 2019), both defendant and E.L. each (separately) attended a Friday night San Francisco Giants baseball game with friends, and then afterwards went to a bar across the street from the stadium called Pedro's Cantina where they encountered each other by coincidence.

E.L. estimated that she arrived at the bar between 10:00 and 10:30 p.m.  By that time she had already consumed two shots of cognac (immediately before arriving at the game, around 6:30 or 7:00 p.m.) and one beer (at the game) and had smoked some marijuana (also before the game).  But she testified that when she got to the bar, she felt "perfectly fine." Defendant too had been drinking with friends, both before and during the game.

Once defendant and his cousin noticed each other at Pedro's Cantina, about a half an hour after she arrived there, the two spent about an hour there together, socializing and drinking with defendant's friends, Ben and Jonathan.  When E.L.'s friend Samantha departed to go to a different bar across town, E.L. appeared to Samantha to be fine and she remained behind with defendant and his friends because he had offered to give her a ride home.  E.L. testified that defendant acted respectfully toward her during their time at the bar, was kind and treated her like a family member and

3

made no effort to touch her inappropriately. Indeed, at one point, one of his friends made a crude sexual comment to her (asking if she was a virgin), and defendant told him to "cut it out," which she appreciated. She testified she felt safe and comfortable with him and was enjoying herself. In all, E.L. consumed three drinks during the roughly one-and-a-half hours she was at Pedro's Cantina: one shot of tequila while socializing with friends before she and defendant spotted each other, another shot of tequila defendant bought for her, and a glass of beer she drank hastily at defendant's urging right before they left the bar.

Defendant and his two friends, Ben and Jonathan, left Pedro's Cantina with E.L. around 11 or 11:30 p.m. E.L. testified that at this point, after having quickly guzzled the beer, she was feeling "pretty drunk." She testified that on a scale from one to ten, she was around a six. She testified that she stayed with defendant rather than going home because she was drunk and "didn't really have any decision-making skills at that point" and knew he would take her home at the end of the night.

## B.     The Second Bar

The group ended up at a second bar called John Collins. The defendant's friend Ben drove them there, after they all walked about 10 minutes to get to his car. E.L. testified she had no recollection of how she got to that second bar and no memory of the car trip. All she remembered was walking on concrete and then at some point arriving at John Collins, presenting her fake ID to the bouncer and walking in.[2] She couldn't

---

[2] Although she was confused about where she was when she left the first bar, she acknowledged that she could still walk and did not stumble.

remember what time they arrived there; Ben estimated it was around midnight.

Defendant's two friends had limited knowledge of what transpired at John Collins. Ben was in and out of that second bar, sometimes going outside to use his phone. He stayed for only about an hour and then left because he lost track of his friends. Defendant's other friend, Jonathan, was so intoxicated he could barely remember the car ride to John Collins and was "blurry" about what happened there. He vaguely recalled seeing defendant at the bar with a young woman and then, after briefly speaking to them, he just went off into the crowd on his own and later on left the bar without ever seeing the two again.

E.L. could not remember much, either. She testified that her memory of John Collins was "cloudy" and that she blacked out while she was there. All she could recall was going inside the second bar, sitting down, taking some videos on her phone and having some drinks with defendant and his friends.[3] She could remember nothing else. She recalled having at least two shots of tequila at John Collins but couldn't recall how much more alcohol than that she might have consumed. Ben didn't see her drink a shot of tequila and did see her have a mixed drink.

E.L. also ingested cocaine while at John Collins but had no recollection of that. Ben testified that about 20 minutes after the group arrived there, he

---

[3] Several videos that she posted to Instagram around 12:21 a.m. were played for the jury, in which she acknowledged she was being playful and having fun. One depicts defendant; another depicts the two of them seated in close physical proximity as defendant makes a peace sign for the camera and puts his hand on her head; and the third depicts a bartender pouring drinks for them. A reasonable factfinder could conclude that E.L. appears to be intoxicated in the second video clip.

saw defendant offer her cocaine and saw the two of them snort it together outside in the doorway of a nearby building. He also saw the two go back outside together for a few minutes one or two more times after that. And a forensic urine analysis confirmed cocaine use by E.L. at some point during a window of time that included when she was at John Collins. E.L., though, testified she did not remember doing cocaine that night.

E.L. testified she felt "really drunk" at John Collins; she could talk and walk and was aware of who she was with, but "my mind kept going in and out of the situation. . . . [¶] Like I knew where I was and then [in] a second I kind of didn't really know where I was and then I would snap back into knowing where I was. I was just starting to feel really intoxicated at that point." She was blacking out, and she estimated that, on a scale of one to ten, her level of intoxication was a nine.

A little bit after midnight, defendant texted E.L.'s father out of the blue with a happy birthday greeting (it recently had been her father's birthday). Her father, who had been asleep and didn't know the two were together, thought it was "weird" but didn't think anything of it and went back to sleep.

Sometime after midnight, at around 12:00 or 12:30 a.m., E.L. placed a drunken phone call to her friend Samantha but had no memory of doing so.[4] Samantha testified she sounded drunk, was slurring her speech, did not sound coherent or alert, and wasn't understanding Samantha's questions.[5]

---

[4] The defense asked her if the phone call of which she had no memory was around the time she was in a car going home, to which she answered yes. However, she had no memory of what time she was in the car. Samantha testified the phone call was at 12:00 or 12:30 a.m., whereas Uber records established that she did not get in the car until 1:54 a.m.

[5] As Samantha described it, "She just sounded different. She sounded—she just kept—when she would ask me where I was I was telling

At the time, Samantha thought it was perhaps because E.L. couldn't hear her very well because it sounded loud in the background and it was also loud where Samantha was (at a bar). But Samantha didn't really know what to think and the conversation just felt "weird." Samantha told E.L. to text her when she got home that night, but no text ever came.

## C. The Car Ride Home

Last call at John Collins was at 1:45 a.m. Evidence of an Uber receipt established, by stipulation of the parties, that defendant escorted E.L. home in an Uber Pool ride share at 1:54 a.m., and arrived at her home 16 minutes later at 2:10 a.m.

E.L. couldn't remember how long they stayed at the second bar and had no memory of leaving there. All she remembered was walking for what felt like "a while" on sidewalk and concrete with defendant and his friends and feeling "really confused." Then, she remembered getting into a car with defendant and people she thought were his friends and thinking his friend was driving, which she later realized made no sense because they had all been drinking. She could remember nothing else of the car ride home. She

---

her where I was and she said she was gonna come to me and I told her I'm leaving to go back home and she just—it was just weird. I could tell something was wrong but I didn't think much of it at the moment because I thought, well, she's with her uncle so she's okay, she is in good hands." Explaining further, she testified, "I kept asking her a question and she would disregard what I was saying and just told me that . . . she was gonna come to the bar that I was at, but I kept telling her I'm not at the bar, I'm leaving [to go] home. And I asked her if one of my friend's uncle[s] was still there and she just disregarded it and just kept saying something else. So I just felt that the whole conversation was a little weird to me. I just could tell something was not up, but I just thought that, oh, okay, maybe she's just intoxicated but she's okay because she's with her uncle."

was feeling "really confused" and "[r]eally, really drunk at that point." On a scale from one to ten, she testified she was "like a ten because . . . it was really foggy. All I remember from the car ride is being inside of a car for an undetermined amount of time."

While apparently still at the bar, E.L. had a text exchange with her brother that ended around 1:33 a.m., but she had no recollection of texting with him. Only a portion of the text exchange was introduced into evidence (through a screen shot) and it does not indicate what time the exchange began. E.L. indicated to her brother that she would contact him when she got home so she wouldn't have to ring the buzzer (which was a reference to their locked front door), said she was with "Anndredito" which was a reference to her ex-boyfriend, and the rest was gibberish to him.[6] At trial, she testified she was so drunk that the reference to "Anndredito" was a typographical mistake; she told police she was so drunk when she sent the text that she thought she was with her ex-boyfriend.

Meanwhile, defendant was reaching out to E.L.'s father. At around 1:30 a.m., which was about 25 minutes before the two got into an Uber, defendant called her father twice but her father didn't pick up when he heard the phone ring. Then her father got worried, and so he got out of bed and returned defendant's phone calls. The two spoke, and defendant told her father he was with E.L. and asked her father where to bring her, and her father asked defendant to bring her home. E.L.'s father then checked his daughter's whereabouts with a tracking app on his phone and could see they

_____

[6] In response to her brother's question at 1:33 a.m. if she was coming back soon, she answered: "tell a helita imm with anieliya," to which he responded, "What?" She then said, "imm with anndredito too."

8

were near Yerba Buena Gardens on Mission Street. Her father texted defendant around 1:51 a.m. asking if E.L. was still with Samantha, and defendant responded, "I'm gonna drop her off at [—] Street" where they lived. Then her father tried to call his daughter to see if she was okay. He testified she called him back, around 2:00 a.m., and said she was coming home. It was a quick call, just a couple of words and they did not converse, and he couldn't tell she was drunk and was not concerned. But he stayed up waiting for them to arrive, and when their car pulled up he walked outside to greet them.

### D. Arriving Home

All E.L. remembered after her dim memory of a car ride was seeing her mother "for a second" at the top of the stairs and "[j]ust being really excited to see my mom." She had no memory of anything else, including going to bed. After that, all she remembered was being awakened in her bed in the middle of the night by defendant sexually assaulting her. However, testimony from her family and other evidence filled in the gaps between those memories.

As noted, Uber records established that E.L. arrived home around 2:10 a.m.

According to the sole toxicology expert (called by the prosecution), a forensic analysis of blood and urine samples taken the next day indicated that at this point in the night (at 2:30 a.m., specifically) her blood alcohol level would have been around .22, a figure that is nearly triple the legal driving limit (.08). At that level of intoxication, the toxicologist testified, an individual would experience a range of potential impairments, depending on a variety of factors (including the pace at which they consumed the alcohol, their alcohol tolerance, their metabolism, their body weight and gender): "It might vary from euphoria, excitement, increased sociability [and] decreased

9

inhibitions [a]ll the way down to slowed speech, impairment in memory . . . that can actually lead to blackouts" as well as "sedation, . . . being [so] lethargic" and also potentially even losing consciousness. Alcohol consumption, he testified, has the potential to impair not just a person's judgment and cognition but also their motor functioning, including even impacting their ability to move and use their muscles, and can result in someone becoming passive and unable to resist. Any cocaine in her system, the effects of which can last potentially up to two hours, would have increased the impact of the alcohol she consumed. Based on a case-specific hypothetical, he opined that a person in her situation, given her size and alcohol and drug consumption that night, might have experienced an "instant high" from cocaine followed by potential lethargy as they withdrew from the cocaine, as well as patchy memory followed potentially by a full blackout; their motor functions would likely be impaired to some degree (potentially manifesting in stumbling or being unable to walk without assistance); and so would their cognitive functioning. The person's ability "to think about the stimuli and about their surroundings and make decisions and thoughts about that," he testified, "would likely be affected." He also testified that cognitive impairments such as slurred speech or difficulty making judgments would be outwardly apparent to other people.

Both of E.L.'s parents described her condition as heavily intoxicated when she arrived home and largely consistent with the toxicologist's testimony. Her father testified she was incoherent and wobbly, and a 9 on an intoxication scale of 1 to 10. Her mother testified she was "completely intoxicated" and also put her at a 9, with 10 being completely passed out. Her mother also testified they had to rely on defendant for information about

10

what had happened, because E.L. was unable to follow or engage in conversation.

Her father saw her get out of the car and, although she walked up to him without assistance and without stumbling or falling, she looked wobbly to him. He then helped her get up the front stairs because she couldn't climb them by herself. Her mother, meanwhile, had emerged at the door at the top of the stairs. When E.L. reached her mother, she put an arm around her mother and began leaning on her mother, who had to hold E.L. up by the pant loops to help her walk. E.L., according to her mother, was just laughing and repeatedly blurting out, "Mommy, Mommy, I love you. You're my best friend."

At some point in this timeframe, defendant was talking to her mother, explaining. He told her mother he had run into his cousin at Pedro's Cantina, she was with friends who were planning to go to another bar, and he saw that she was drunk. So he told her friend she should remain with her family. He didn't mention buying her shots of tequila or taking her to another bar himself.

Defendant had a similar conversation with E.L.'s father. Defendant merely told her father that she had said she was going to go to another bar on Polk Street with her friends but he thought it wasn't a good idea and wanted to bring her home to be safe. Defendant did not mention her level of intoxication to her father as a reason he brought her home, but simply told her father he had said to her, "No, no, you're gonna stay with me and I'm going to take you home." Again, he did not mention he had bought her shots of tequila or that he had taken her to another bar after Pedro's Cantina.

11

While the two men were talking, E.L.'s mother helped her into the kitchen and then to her bedroom, where she needed her mother's help to undress because she couldn't do it herself. Her brother, who had been awakened by the commotion and had gotten up to see what was going on, saw defendant talking with his father and overheard (but did not see) his sister stumbling and mumbling while their mother was getting her ready for bed.

E.L.'s mother took off her jacket and her top shirt layer, leaving her still clothed in a white top, her pants and her underwear. Then her mother walked her toward her bed, which was one of two in the room, and E.L. flung herself onto it. But she immediately got up and then "threw" herself onto the other bed, which was not the one she normally slept in.[7] As she did so, her top came down and she pulled it back up and reached for the comforter. Her mother placed the comforter on top of her and asked if she wanted some water. E.L. didn't answer.

By this point (the precise timing is unclear), defendant and E.L.'s father had come to the bedroom doorway where they were watching what was going on. Defendant repeatedly asked her, "Do you want water? Do you want water?" but she didn't answer him, either. So her mother told him, "I'm going to get her some water" and left the room to get it.

---

[7] Both her brother and her mother denied that she fell down. Her brother told police he heard his sister stumble *and fall* but at trial he testified "the best way I can describe it is just stumbling. I don't think—I wouldn't necessarily call it falling." Their mother also denied that she fell down as she was getting into bed. She too mentioned a "fall" in a statement she gave to police (the statement said, "She threw herself on the far bed by the window, falls, and switches to the other bed") but she testified that her statement was in Spanish and there was a problem with the English language translation. She testified she never saw her daughter fall or bump into anything that night.

When her mother came back to the bedroom, defendant had stepped inside the room. Along with water her mother had brought a trash can, and she placed it beside her daughter's bed in case she vomited. Her daughter was lying in bed awake but said nothing. Defendant urged his cousin to "drink your water." Then he and her mother left the bedroom and closed the door. Her mother estimated that, from start to finish, it took about 10 or 15 minutes to get her to bed from the time she arrived home.

After E.L. was put to bed, her parents spoke briefly with defendant. At her mother's request, her father (in pajamas) offered to drive defendant home, which was less than 10 minutes away. He declined the ride, said, "No, it's okay. I could stay here," and asked for some alcohol and the remote control to their television.[8] Even though defendant had never slept there before, her father didn't think his offer to sleep over was odd because he was family. So her father gave him a beer and the remote, and defendant turned on the television which came on at a loud volume. Her mother made up a bed for defendant on the couch in the living room, which was near her daughter's bedroom; they thanked him for bringing their daughter home and then went back to bed in their bedroom, which was downstairs directly underneath the living room.[9]

They had no concerns about defendant's behavior when they saw him that night. He wasn't acting inappropriately toward their daughter, didn't

---

[8] Her father did not tell police defendant asked for alcohol, but he testified the question was not asked.

[9] Her mother estimated they went back to bed 30 or 40 minutes after the episode began, possibly between 2:15 and 2:45 a.m.; her father said it was about 30 minutes.

seem to be rushing them out of the living room and back to bed, and seemed to be acting normally. They fell asleep and heard nothing further that night.

Meanwhile, back in his own bedroom, which was next to his sister's room, E.L.'s brother overheard her get up and go to the bathroom and then go back into her room and close the door. Then a short time later (anywhere from 10 minutes to less than an hour after he himself had gone back to bed), he heard his sister "moaning" in her bedroom (a sound he demonstrated for the jury), and a few minutes after that he heard three "slapping" sounds.[10] He has no idea what sex sounds like, didn't know what was happening and assumed she was "moaning" because she was feeling sick since she was drunk. The television was on in the nearby living room, and it was so loud it was keeping him awake. So he peeked out of his bedroom, and when he did so he observed defendant was not on the couch.

---

[10] There is no audio record of her brother's demonstration of the "moaning" sound he heard. In closing argument, however, the prosecutor addressed the sound he had made on the witness stand: "He heard moaning. On the stand [he] was subjected to the question, Can you replicate the moan. I'm certainly not going to do it because you all heard for yourself. But this moan is not a moan. *It's a groan.* It's the noise of someone who is so incredibly intoxicated that [her brother] thought it was the noise of his sister being sick from alcohol. *It was not a noise of pleasure.* It was likely the noise of him forcing her limp body to have sex with him." (Italics added.)

When defense counsel made his closing argument to the jury, he did not contradict the prosecutor's characterization of the sound her brother demonstrated for the jury as "not a noise of pleasure." He argued merely: "[Her brother] heard this moaning. And although he told police he heard moaning, demonstrated to the police the moaning, told you he heard moaning, . . . [the prosecutor] said it's groaning and something different. So [the prosecutor] has her own take on it but he said it was moaning. And he made the sound for you. Without him we don't have any sounds coming from that room. But certainly with him we know there's no yelling, screaming, fighting, anything like that, saying no, protesting, anything like that."

14

### E. The First Incident, at Night

As noted, E.L. had no memory of getting out of the car, getting ready for bed, going to her room, getting tucked in by her mother or getting up to go the bathroom. What she did remember was being awoken from her sleep by the experience of getting vaginally penetrated from behind by defendant's penis.

She described her memories of that sexual encounter in graphic detail for the jury, describing not only sexual intercourse but also defendant forcing his penis into her mouth and performing oral sex on her. She also testified that in therapy, sometime around October 2018, she recalled something about the assault she had not previously told anyone involved in the case (including the treatment providers who saw her immediately afterwards or police): that he was hitting her a lot while he was penetrating her from behind, which was "really scary."

She testified she was still intoxicated while this was going on, and "[i]t felt like a really bad dream." She was "beyond a ten" on the scale of inebriation, did not have a clear memory of what was happening, and could not do anything while he was having sex with her—push him off her, resist, scream for help, talk or even move—because she was so drunk she was just a "limp body." She described slipping in and out of consciousness, explaining that "I would be awake for one second" and then "[i]t would turn black and then I would wake up again to just being assaulted." When he put his penis in her mouth she was "horrified" but couldn't stop him, and "I felt like I was gonna die. Like I thought I was quite literally going to choke and die." She did not want any of it to happen, could not think clearly, and would not have

15

consented under any circumstances to have sex with defendant. Never would she consent to have sexual relations with a relative.

## F.      The Second Sexual Assault, in the Morning

E.L. woke up the next morning (Saturday) around 7:50 a.m., scared, confused, still intoxicated (she estimated around an eight or nine) and naked, although she does not normally sleep naked. By this point, according to the forensic toxicologist, her blood alcohol level would have been around .14, still nearly twice the legal limit.[11] She had a headache and was extremely dehydrated but, at this point, had no trouble walking and so she got up and went to the bathroom for water. She saw defendant on the living room couch, but neither said a word. She returned to the bedroom, closed the door and began getting dressed; a few seconds later, he entered her room. He kissed her and, because she was afraid he would rape her again, she did not pull away and kissed him back. Without saying a word, he reached into her underwear and began touching her vagina; in shock, she pulled away from him twice before he relented. Then he left the room. She hid in her room, disoriented and exhausted, where she fell back asleep until after he left. Her father drove defendant home at around 11:30 a.m.

## G.      Reporting the Assault

Later that morning, after defendant had gone, E.L. called her friend Samantha and told her what had happened. She did not yet tell her parents because they had a birthday event to attend and she did not want to ruin the occasion. By the time she saw her friend, she had started to notice she had a

---

[11] He described in some detail the kinds of impairments a person would still experience at that level which, although they would not likely entail a loss of consciousness or stupor, could still involve lethargy, slight motor function impairment and "definitely" memory impairment.

16

small black eye, as well as bruising on her left leg and right arm, injuries for which she could recall no explanation but the assault of the previous evening.

Samantha took her to San Francisco General Hospital, where she remained for several hours and blood and urine samples were collected. She was throwing up from the effects of the alcohol and was given anti-nausea medication but declined to undergo a sexual assault examination that day because she would have had to wait several hours for the exam to begin, and she was too distraught and sick to wait around that long, preferring instead to return the next day. Samantha noticed bruising on her leg and under her eye which neither Samantha nor E.L.'s mother had noticed the previous day.

The following morning, Sunday July 15, E.L. told her parents what had happened. She told them she didn't want it to ruin her life and wanted to go to work later that day. So that afternoon, before she went to work, her parents summoned a family meeting with other relatives to tell them what had happened and discuss the situation. At the meeting, they exchanged their recollections of the previous Friday night. They also prepared written statements to give to police.

At around 9 p.m., after work, E.L. returned to the hospital where she underwent a sexual assault examination. The nurse who performed it was qualified as an expert in sexual assault examinations and testified extensively about her findings as well as E.L.'s responses to her questions. She found bruises on both of E.L.'s arms (four on her right arm, including one on her shoulder, two on her triceps and one on the back of her forearm; and one on her left forearm), and a bruise on her upper left thigh. All were tender to the touch, which she testified gives some general indication of when the bruises happened (although not how), because tenderness does not last as

17

long as visible bruising itself. She testified that, as is common with adult rape victims, there were no other signs of trauma including in E.L.'s genital area, and that the absence of physical injury does not correlate to whether an adult was raped.

DNA collected from E.L. during the exam was later found to match defendant's. Specifically, his sperm DNA was found on her underwear and neck; his non-sperm DNA was found on her lips and breasts. His DNA was not found on her external genitalia, vagina or cervix.

On July 24, about 10 days after the incident, E.L. contacted police and was interviewed. The same day, she discovered a Facebook message defendant had sent her, apparently around the time of the incident, stating, "How are you? We have to talk." She opened the message after the police told her she could do so, showed it to them, and did not respond to it.

The following day, July 25, defendant was arrested.

## H.     The Aftermath

E.L. testified briefly about the incident's impact on her life. She testified, "It's changed my life completely. I feel like it's touched every aspect of my life. Not just personally but with school, my friends." She testified their family couldn't even stand to look at their home anymore and so they bought new furniture; and she switched bedrooms with her brother because she could not even be in the room where she had been assaulted. She dropped out of college because of anxiety, she has trouble being around people because she has trust issues, her family had severed all communication with the defendant's family and the incident had changed their entire family dynamic. Her father corroborated that she had dropped out of school because of the incident and now suffers from a lot of anxiety.

18

## I.    These Proceedings

By amended information, the People charged defendant with nine counts:  one felony count of rape by use of drugs (Pen. Code, § 261, subd. (a)(3))[12] (count one), in substance alleging unlawful sexual intercourse with a victim who was prevented from resisting due to intoxication; one count of rape of an unconscious person (§ 261, subd. (a)(4)(A)) (count two), in substance alleging unlawful sexual intercourse with an unconscious or sleeping victim; two felony counts of oral copulation by anesthesia or controlled substance (former § 288a, subd. (i), renumbered § 287, subd. (i) by Stats. 2018, ch. 423, § 49, effective Jan. 1, 2019) (counts four and six), in substance alleging the victim was prevented from resisting due to intoxication; two felony counts of oral copulation of an unconscious person (§ 288a, subd. (f)) (counts three and five), in substance alleging the victim was unconscious; and three counts that, as later explained to the jury in closing argument, pertained to defendant's actions the following morning (i.e., touching her vagina against her will).  Those "next morning" charges included two felony counts of sexual penetration with a foreign object, one of them alleging force and violence (§ 289, subd. (a)(1)(A)) (count seven) and the other alleging the victim was intoxicated (§ 289, subd. (e)) (count eight), as well as one misdemeanor count of sexual battery (§ 243.4, subd. (e)(1)) (count nine).

The matter proceeded to a jury trial, at which the principal witnesses were E.L., six witnesses to the events that night (her parents, her brother, her friend Samantha, and defendants' two friends Ben and Jonathan), the

---

[12]  All further statutory references are to the Penal Code unless otherwise indicated.

19

rape treatment nurse who performed E.L.'s sexual assault examination, the prosecution's forensic toxicologist, the investigating detective and a rape trauma expert proffered by the prosecution whose testimony we discuss below.

At the conclusion of trial, the jury deliberated for about a day and a half until one juror was excused for refusing to follow the law.[13] An alternate juror took his place, and the jury was ordered to begin deliberations again from the beginning with the replacement juror.

The newly constituted jury then deliberated for a day and, without asking any questions, reached a verdict. It convicted defendant of rape by intoxication (count one) and two counts of oral copulation by intoxication (counts four and six), acquitted him of the parallel charges concerning an unconscious victim (counts two, three and five), convicted him of two of the "next morning" charges (counts seven and nine, sexual penetration by foreign object by force and misdemeanor sexual battery) and acquitted him of one (count eight, sexual penetration of an intoxicated victim).

The defendant unsuccessfully moved for a new trial on multiple grounds and was sentenced to nine years in state prison. This timely appeal followed.

---

[13] About three hours into these initial deliberations the jury requested, and received, a readback of E.L.'s testimony "regarding being touched and kissed the following morning."

20

## DISCUSSION

## I.

## *Instructional Error*

Defendant asserts two errors in the instructions concerning the required mental state for the three felony charges of which he was convicted for the incident in the middle of the night,[14] which were premised on E.L.'s intoxicated state (i.e., rape by intoxication and two counts of oral copulation by intoxication).

By way of general background, and as defendant has consistently acknowledged both below and on appeal, actual consent is not a defense to these charges.[15] (See *People v. Sta Ana* (2021) 73 Cal.App.5th 44, 61*; People v. Giardino* (2000) 82 Cal.App.4th 454, 461 (*Giardino*).) Rape by intoxication is defined in relevant part as "an act of sexual intercourse" where "a person *is prevented from resisting* by an intoxicating or anesthetic substance, or a controlled substance, *and this condition was known, or reasonably should have been known by the accused.*" (§ 261, subd. (a)(3), italics added.) Oral copulation by intoxication is defined in relevant part in identical terms: as copulation between the mouth of one person and the sexual organ of another

---

[14] These assaults, by all accounts, took place sometime in the early morning hours, but we refer to them as having occurred at "night" to distinguish them from those that took place after E.L. arose later that morning.

[15] The two convictions stemming from the second incident the following morning do require lack of consent. Forcible sexual penetration involves an act of sexual penetration "accomplished *against the victim's will* by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury." (§ 289, subd. (a)(1)(A), italics added.) Misdemeanor sexual battery involves the touching of an intimate part of another person, with a specified sexual motive, "against the will of the person touched." (§ 243.4, subd. (e)(1).)

person "where the victim is *prevented from resisting* by any intoxicating or anesthetic substance, or any controlled substance, *and this condition was known, or reasonably should have been known by the accused . . . .*" (§ 287, subd. (i), italics added.)

The jury was instructed on these charges as follows:

"The Defendant is charged in Count One with raping a woman while she was intoxicated in violation of Penal Code Section 261 (a)(3). To prove that the Defendant is guilty of this [cr]ime the People must prove that: One, the Defendant had sexual intercourse with a woman; two, he and the woman were not married to each other at the time of the intercourse; three, the effect of an intoxicating substance prevented the woman from resisting; and, four, the Defendant knew or reasonably should have known that the effect of an intoxicating substance prevented the woman from resisting.

"Sexual intercourse means any penetration, no matter how slight, of the vagina or genitalia by the penis. Ejaculation is not required.

"A person is prevented from resisting if he or she is so intoxicated that he or she cannot give legal consent. In order to give legal consent a person must be able to exercise reasonable judgment. In other words, the person must be able to understand and weigh the physical nature of the act, its moral character, and probable consequences. Legal consent is consent given freely and voluntarily by someone who knows the nature of the act involved. If the victim is so unsound of mind that she is incapable of giving legal consent, the fact that she may have given actual consent is not a defense."

The instructions on oral copulation of an intoxicated victim were identical, but for the elements defining the sexual act of oral copulation.

22

As noted, defendant now asserts two errors in these instructions. We address each in turn.

## A. The "Mistaken Belief" Issue

Defendant argues, first, that his convictions for rape and oral copulation by intoxication should be reversed because the court erroneously refused his request to instruct the jury on a complete defense to those charges: that is, with optional language in the Judicial Council-approved jury instructions for each offense stating as follows: "The defendant is not guilty of this crime if he actually and reasonably believed that the woman was capable of consenting to [the act], even if that belief was wrong. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman was capable of consenting. If the People have not met this burden, you must find the defendant not guilty." (See CALCRIM Nos. 1002, 1017.) This, he says, not only constituted state law error but also an error of federal constitutional dimension.[16]

We do not agree. There was no error, and even if there were it was harmless.

The court instructed the jury in this case, "Whenever I tell you the People must prove something[,] I mean they must prove it beyond a reasonable doubt." On rape by intoxication, it instructed as follows:

"To prove that the Defendant is guilty of this [cr]ime the People must prove that: One, the Defendant had sexual intercourse with a woman; two,

---

[16] Defendant asserts in an argument heading this point also pertains to his conviction for sexual penetration by intoxication but he was acquitted of that charge.

23

he and the woman were not married to each other at the time of the intercourse[17]; three, the effect of an intoxicating substance prevented the woman from resisting; and, four, the Defendant knew or reasonably should have known that the effect of an intoxicating substance prevented the woman from resisting.

"Sexual intercourse means any penetration, no matter how slight, of the vagina or genitalia by the penis.  Ejaculation is not required.

"A person is prevented from resisting if he or she is so intoxicated that he or she cannot give legal consent.  In order to give legal consent a person must be able to exercise reasonable judgment.  In other words, the person must be able to understand and weigh the physical nature of the act, its moral character, and probable consequences.  Legal consent is consent given freely and voluntarily by someone who knows the nature of the act involved. If the victim is so unsound of mind that she is incapable of giving legal consent, the fact that she may have given actual consent is not a defense."

These instructions made clear that to prove the defendant was guilty of rape of an intoxicated woman, the People had to prove beyond a reasonable doubt that he knew or should have known E.L. was so intoxicated that she was incapable of giving legal consent.

Our high court has held and reaffirmed on many occasions the rule that, while a defendant may be entitled to a requested pinpoint instruction in some circumstances, a trial court " 'properly refuse[s] an instruction offered by the defendant if it . . . is . . . duplicative.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1021; see *People v. Moon* (2005) 37 Cal.4th 1, 30; *People v.*

---

[17] The requirement that the victim and defendant not be married has since been abolished.  (See Stats. 2021, ch. 626, § 17; CALCRIM No. 1002.)

*Harrison* (2005) 35 Cal.4th 208, 253-254; *People v. Bolden* (2002) 29 Cal.4th 515, 558 (*Bolden*); *People v. Catlin* (2001) 26 Cal.4th 81, 152 (*Catlin*).)  "An instruction that does no more than affirm that the prosecution must prove a particular element of a charged offense beyond a reasonable doubt merely duplicates the standard instructions defining the charged offense and explaining the prosecution's burden to prove guilt beyond a reasonable doubt. Accordingly, a trial court is required to give a requested instruction relating the reasonable doubt standard of proof to a particular element of the crime charged *only when the point of the instruction would not be readily apparent to the jury from the remaining instructions*."  (*Bolden,* at pp. 558-559, italics added [no error in refusing requested pinpoint instruction focusing on one element of robbery where instructions given concerning prosecution's burden of proof and elements of robbery were "accurate and complete" and "nothing in the particular circumstances of this case suggested a need for additional clarification"].)

The instruction defendant requested here basically restated and duplicated the instruction the court gave on the elements of the crime, by telling the jury a defendant is not guilty of rape of an intoxicated person if he actually and reasonably believed the woman was capable of consenting to sexual intercourse.  This simply restated, in reverse, the last element in the instruction on that crime—that the prosecution was required to prove that the defendant knew or reasonably should have known E.L. was incapable of resisting, meaning so intoxicated that she could not give legal consent.  The point was adequately covered by the instructions the court gave on the prosecution's burden and the elements of the crime.

25

In *People v. Lujano* (2017) 15 Cal.App.5th 187 (*Lujano*), our colleagues in Division Seven of the Second District rejected the same instructional error claim in the context of a charge of *sodomy* by intoxication (see § 286, subd. (i)), and held the trial court's refusal to give the additional instruction was neither wrong nor prejudicial. The jury instructions given in *Lujano* were precisely the same as in this case but for language addressing the element of the sexual act involved (which was sodomy, rather than rape and oral copulation) and one immaterial omission.[18] (See *Lujano,* at pp. 191-192). The defendant asserted the trial court prejudicially erred by refusing to instruct the jury with the same optional language defendant requested here. (See *id*. at p. 192.) *Lujano* held both that there was no error in refusing the additional language, and that any error was harmless even if reviewed for federal constitutional error under *Chapman*.[19] (See *Lujano,* at pp. 189, 192, 195-196.)

*Lujano* concluded, first, that the requested instruction was properly refused because it merely duplicated the instruction setting forth the elements of the offense. (See *Lujano, supra,* 15 Cal.App.5th at pp. 189, 193-194, citing *Bolden*.) Specifically, it reformulated *in the negative* the third element of the offense already addressed by the instruction, which required the People to prove that the defendant "knew or reasonably should have known that the effect of that [intoxicating] substance prevented the other

---

[18] The instructions given in *Lujano* did not include the final sentence used here, stating that, "If the victim is so unsound of mind that she is incapable of giving legal consent, the fact that she may have given actual consent is not a defense." Defendant does not discuss this minor difference nor assert it is a material distinction, and we do not perceive it as one either.

[19] *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).

person from resisting") and duplicated the definition of "prevented from resisting." (*Lujano,* at p. 193; see also *id.* at pp. 191-192.) "[I]nstead of saying that the defendant can be guilty only if he knew or reasonably should have known that the victim was prevented from resisting," *Lujano* summed up, "the optional language says that the defendant is not guilty if he actually and reasonably believed that the victim was capable of consenting." (*Id.* at p. 193.) It continued: "The court has no sua sponte duty to use the language that Lujano requested, even if it is supported by substantial evidence, because the issues addressed are fully covered by the instructions on the third element and the definition of 'prevented from resisting.' And even when the optional language is not only supported by substantial evidence but also requested by the defendant, the court may decline to give it because it ' "merely duplicates other instructions." ' [Citations.] The trial court therefore did not err by denying Lujano's request." (*Id.* at pp. 193-194.)

Here, as in *Lujano*, there was no error in refusing the requested instruction concerning the defendant's subjective state of mind. The jury was instructed using precisely the same language as in *Lujano*, and its reasoning is consistent with the long line of California Supreme Court authority we have set forth above.

Our colleagues in Division One of this court also addressed the optional instruction in the CALCRIM instruction and likewise rejected the defendant's argument that the trial court was required to give the optional language as a pinpoint on request. (*People v. Braslaw* (2015) 233 Cal.App.4th 1239, 1244-1247 (*Braslaw*).) Justice Banke, writing for a unanimous panel, rejected the argument on two grounds, the first being that there was no evidence regarding defendant's belief in the victim's capacity to consent. (*Id.* at

27

p. 1245.) Second, the court held that "[e]ven if there was an evidentiary basis for giving the additional language regarding actual and reasonable belief in the capacity to consent, the trial court's decision to omit it was not prejudicial error in light of the adequacy of the instructions it did give." (*Ibid.*) The requested optional instruction, it opined, "would have served the same purpose of essentially rephrasing the requirement of element four in ensuring CALCRIM No. 1002, ensuring no defendant is convicted unless he knew or reasonably should have known the victim was incapable of giving consent due to intoxication. Had defendant wanted to argue to the jury, in connection with the fourth element, that he had a reasonable belief the victim could consent, he was free to do so. Moreover, the jury in this case, by finding the fourth element true, necessarily found any belief by defendant that the victim had capacity to consent was unreasonable."[20] (*Braslaw,* at p. 1246, fn. omitted.)

Even if *Lujano* was wrongly decided—an argument defendant does not make—such that the trial court's refusal to give the optional instruction had been error, we conclude for the same reasons as was held in *Braslaw* and also in *Lujano,* any such error was harmless. Under the instructions given in this case, the jury found defendant guilty of rape by intoxication. To do so, it necessarily found defendant either knew, or reasonably should have known, E.L. was so intoxicated she could not give legal consent. In other words, the jury made an adverse finding against defendant on the mental element of the

---

[20] Although Division One framed its second ground for rejecting the argument in terms of prejudice, its observation in that context that the optional instruction "would have served the same purpose of essentially rephrasing the requirement of element four" of the basic CALCRIM instruction on rape by intoxication supports *Lujano*'s conclusion that it is duplicative and there was no error in declining to give it.

crime that was the subject of his requested instruction. Reciting the principle that "[o]mission of an instruction is harmless beyond a reasonable doubt if ' "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions," ' " the court in *Lujano* reasoned the jury in that case necessarily found any belief by the defendant that the victim had the capacity to consent was unreasonable, because the jury necessarily found, under the instructions that *were* given, that the defendant knew or reasonably should have known that the victim was so intoxicated that he lacked the capacity to give legal consent. (*Lujano, supra,* 15 Cal.App.5th at pp. 195-196.) And as we have explained, in *Braslaw*, Division One of this court reached the same conclusion for the same reason. We agree with its analysis that any error was harmless.

Defendant does not argue *Lujano* was wrongly decided. Rather, he contends it is distinguishable. His arguments are not persuasive.

He argues that during closing argument, the prosecutor "implied to the jury that mistaken and reasonable belief in capacity to consent is not a defense, and the Court did not explicitly correct the prosecutor." This contention is based on an objection the prosecutor interposed during the defense closing argument, and we will discuss it in greater detail, *post*. The first problem with the argument, though, is that defense counsel did not object to the prosecutor's statement or request any curative instruction and therefore forfeited any claim that one was warranted because of what

29

transpired during closing arguments.[21] (See *People v. Williams* (2016) 1 Cal.5th 1166, 1188.)

But even if the argument had not been forfeited, we would reject it. Defendant cites no authority suggesting the failure to give an instruction not otherwise erroneous can *become* erroneous based on subsequent developments at trial during closing argument; nor are we aware of any. Defendant's attempt to distinguish *Lujano* based on the prosecutor's objection in closing argument in this case thus fails. Further, if we construe defendant's argument as a contention that closing arguments made the "erroneous" omission of a requested argument prejudicial, we do not agree with its premise. Neither the prosecutor (*nor* the trial court) implied to the jury during closing argument that defendant could be convicted even if he had a mistaken but reasonable belief that E.L. had the capacity to consent. On the contrary, the prosecutor *accurately* told the jury that proving defendant had the required mental state was the People's burden and that any reasonable doubt as to defendant's subjective mental state would preclude a conviction.

The prosecutor did so when she outlined the elements of rape by intoxication, telling the jury "it's my burden and so I ask for your patience while I try to explain this because it's important." She referred the jury to its packet of written instructions and then specifically acknowledged that for rape of an intoxicated person, the People had the burden to prove "that he had sexual intercourse with her," that "they're not married," "that an

---

[21] The People argued forfeiture below in opposition to defendant's motion for a new trial, where the issue was packaged both as a claim of instructional error *and* prosecutorial misconduct.

intoxicating substance prevented her from resisting" and "finally, knowledge." She elaborated on the knowledge element, tracking the language of the CALCRIM instruction given (No. 1002):

"He has to know or reasonably should have known that the intoxicating substance prevented her from resisting.

". . . What is the issue? What we're asking you to decide is whether or not this substance prevented her from resisting and whether or not he knew that or should have known that. That is the issue in this case.

[¶] . . . [¶]

"Prevented from resisting. What does that mean? It means that she is so intoxicated, so drunk that she can't give legal consent. Legal consent is making a conscious decision, weighing the nature of the act, making an assessment about the moral character."

Later, the prosecutor discussed the evidence she contended proved defendant's state of mind about E.L.'s level of intoxication. This included his text and phone calls to her father,[22] her stumbling and inability to walk up the stairs without help, his presence in the bedroom doorway and inside E.L.'s bedroom as her mother undressed her, helped her into bed and gave

---

[22] "Why did the Defendant have to call her dad? Why did he have to wake him up in the middle of the night? He texted and then he called more than once. He called more than once because that's how drunk she was, that he had to call [E.L.'s father] to give him a warning about the chaos that was about to happen when his daughter walked through the door. This phone call is incredibly important because it shows the Defendant's state of mind. He called his cousin [E.L.'s] dad because he knew [E.L.] was drunk. So drunk that she couldn't come home by herself. So drunk that she couldn't call her dad herself. So drunk that she couldn't text her brother. And the Defendant knew that. That's why he calls the father at 1:30 in the morning to wake him up, to let him know his daughter is about to come home drunk."

31

her a trash can and a drink of water and his own statements encouraging her to drink, as well as the fact that his later Facebook message to her reflected consciousness of guilt ("He knew he took advantage of his cousin. Otherwise, he wouldn't have bothered to contact her").

Defense counsel argued this point to the jury too, even more extensively. In the portion of argument defendant now focuses on in his appellate brief, defense counsel argued that "[a]ctual and reasonable belief in a capacity to consent is a full defense. In other words, if you believe that Rene Fonseca believed both actually and reasonably that [E.L.] had the capacity to consent, that's a complete defense." The prosecutor interposed an objection that the comment "[m]isstates the law,"[23] to which the trial court

---

[23] The prosecutor was not entirely incorrect. Defense counsel's statement that an actual and reasonable belief was a "complete defense" was potentially misleading, suggesting it was an affirmative defense that the defendant had the burden to establish. As the *Lujano* court explained, whereas a mistaken belief that the victim consented is an affirmative defense to a charge of forcible rape, a charge of rape of an *intoxicated* victim requires the prosecution to prove the defendant knew or reasonably should have known the victim was incapable of consenting as an *element* of the offense. (*Lujano, supra*, 15 Cal.App.5th at pp. 194-195.) As in that case, the "defense at issue here—that the defendant actually and reasonably believed that the victim was capable of giving legal consent—is merely the negation of an element of the offense." (*Id.* at p. 195.)

The prosecutor's conduct in no way resembles the authority defendant cites, where the trial court overruled a meritorious objection *by defense counsel* to repeated misstatements of law by the prosecutor in her closing argument and did not admonish the jury or otherwise attempt to cure the prosecutor's misstatements of law. (See *People v. Lloyd* (2015) 236 Cal.App.4th 49, 62-64.) The prosecutor's actions were held to constitute prosecutorial misconduct—a claim not asserted here—and held prejudicial in the factual circumstances of that case. (*Ibid.*)

responded, "Well, again, the law is as the Court stated." That is where defendant's analysis ends on appeal.

But that is not where it ended in the trial court. The trial court did not sustain the prosecutor's objection, nor did it admonish defense counsel. Thus, immediately after this interchange, defense counsel picked up exactly where he had left off and carried on in depth. He argued: "So *the law is what it is*. It's not going to change in our closing arguments and *this is an accurate statement of the law*. [¶] What [the prosecutor] has to do is prove to you what's happened in Mr. Fonseca's mind at the time. Because *she has to prove what he reasonably believed at the time. And if he reasonably believed that she was okay to consent at the time of sex that's a full defense. Cannot be convicted.* Just like for the acts the next morning, an actual and reasonable belief in consent is a full defense. In other words, it's not whether a person consented. *It's also whether the Defendant had a belief that she did.* This happens when there's lack of communication. When you're not really sure. When two people are acting and there isn't a contract. You know, there isn't a written statement about whether I consented. [¶] We'll talk more about that." (Italics added.)

And he did. He argued that what happened during the car ride home supported a finding defendant reasonably thought she had the capacity to consent which he again told the jury was a "complete defense."[24] He also

---

[24] Specifically, defense counsel urged the jury to consider the possibility that, because E.L. thought she was with her ex-boyfriend on the ride home, she might have acted on those feelings by touching defendant or coming on to him. There again, defense counsel stressed that "*if* [*defendant's*] *belief is actual and reasonable that she is consenting or has the capacity to consent*, *that's a complete defense* and that defense might be relying on how she's acting because she herself is confused. *So that is extremely relevant and*

made an argument that evidence that she *did* consent supported a finding he reasonably thought she had the ability to consent.[25]

In sum, both parties made quite clear to the jurors in closing argument both that the People had the burden of proof on defendant's mental state and that the jury could not convict him if jurors harbored reasonable doubt as to whether he actually and reasonably believed E.L. had the capacity to consent. Far from providing a basis to depart from *Lujano*'s holding that there was no prejudicial error in the refusal of the very same requested instruction, these closing arguments provide even greater reason than in *Lujano* and *Braslaw* to conclude any error was harmless.

Defendant also asserts that his requested instruction should have been given notwithstanding *Lujano* because the underlying facts of *Lujano* are "so much different," a point elaborated upon at some length and premised on the theory that the intent element in this case was "much more nuanced." But

---

*important because it's* [*defendant's*] *state of mind that the Prosecution is after*." (Italics added.)

[25] The theory went like this: "[A]ctual consent is important if it happens because it conveys to someone else that that's what you want to do and it may convey to them, depending on how it's given, how well you have a sense of what you want to do. Okay. So if you are directing a sexual encounter because that's what you want to do, that consensual stuff you do can give someone an impression that you know what you want to do and you want this to happen. So although actual consent is not a defense, the actual consent, if it exists, *can lead someone to believe that you have the capacity to consent*[,] *and that belief can be actual and reasonable* because you're saying what you want and you're consenting to what you want. So *if you have a reasonable doubt about actual consent and you can't figure out beyond a reasonable doubt what* [*defendant*] *believed and you can't be convinced beyond a reasonable doubt that he really, really, really, really thought she was incapacitated and wanted to rape her anyway, if you have reasonable doubt about that it's insurmountable. You cannot get past it.* It's incontrovertible." (Italics added.)

34

*Lujano*'s analysis did not turn on the facts of the underlying crime, whether "nuanced" or not; it turned on the fact that the refused instruction was duplicative of the other instructions given in the case. (See *Lujano, supra,* 15 Cal.App.5th at pp. 192, 193.) The same is true here.

Further, the distinction defendant urges is not tenable. It rests on the theory that, given the facts in this case, the jury "could have found that despite that appellant *should have known* that [E.L.] was incapable of resisting, he was *reasonably mistaken* about her capacity to consent." That is not the law. Rape by intoxication requires that E.L.'s incapacity "was known, or *reasonably should have been known* by the accused" (§ 261, subd. (a)(3), italics added) and so does oral copulation by intoxication (see § 287, subd. (i)). If the jury believed defendant should have known E.L. was incapable of consenting, then any mistake about that on his part was necessarily unreasonable. "It would not be consistent for a jury to find that [a defendant] 'reasonably should have known' that [a victim's] level of intoxication prevented her from resisting, and at the same time find that [he] held a 'reasonable belief' that she was able to resist or give consent. A belief that the victim was able to resist could not be reasonable if the perpetrator 'reasonably should have known' that the victim was unable to resist." (*People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1529; see also *Braslaw, supra,* 233 Cal.App.4th at p. 1250 [equating the two concepts].) Defendant cites no law to the contrary.

Finally, defendant argues the instructions as given "make[] no mention of a *mistaken* belief," and so "the jury may have concluded that the fact that [E.L.] was incapable of consenting made it a foregone conclusion that appellant should have known this." But that was true in *Lujano* too—the instructions, as noted, were substantively identical to the ones given in this

case.  Yet the requested instruction was held to be duplicative *in substance*, because it just restated one of the elements of the offense in the negative.  (See *Lujano*, *supra*, 15 Cal.App.5th at p. 193.)  More to the point, the instructions given in this case are not reasonably susceptible to the construction that defendant posits, nor is there any indication in this record that the jury understood them in this way.  They in no way suggest that guilt can be premised solely on a finding that E.L. lacked capacity to consent without a further finding that the defendant knew or should have known that she did.  The instructions given made that clear.  And any theoretical possible doubt about that in jurors' minds would have been squarely put to rest by the parties' closing arguments.

For all of these reasons, then, there was no error.  Including under federal law.  (See *People v. Hovarter*, *supra,* 44 Cal.4th at p. 1022 [refusal of requested instruction did not violate federal constitutional rights to due process of law, a fair trial and equal protection "because the pattern instructions given to the jury adequately covered the same ground as defendant's special instruction"].)  And, as we have said, any error was harmless beyond a reasonable doubt for the same reason as in *Lujano* and *Braslaw*:  because under the instructions given (and as defendant acknowledges in his reply brief), the jury necessarily found defendant knew or reasonably should have known E.L. was too intoxicated to consent.  (*Lujano, supra*, 15 Cal.App.5th at p. 196; *Braslaw*, *supra*, 233 Cal.App.4th at pp. 1246-1247.)

## B.  The Legal Definition of Consent

Next, defendant argues the jury was given an incomplete definition of "consent," because the instructions did not include the full definition set forth in section 261.6.  That statute states:  "In prosecutions under Section 261

36

[rape], 286 [sodomy ], 287 [oral copulation], or 289 [forcible sexual penetration], or former Section 262 [spousal rape] or 288a [oral copulation], in which consent is at issue, *'consent' means positive cooperation in act or attitude pursuant to an exercise of free will.* The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." (§ 261.6, subd (a), italics added; see also Stats. 2006, ch. 45, § 1 [former § 262]; Stats. 2013, ch. 282, § 1 [former § 288a].)

Here, the court did not include instructions tracking the first portion of the statutory language (concerning positive cooperation). As noted above, in instructing the jury concerning capacity to consent, it instructed the jury as follows, which included language tracking only the second portion of the statutory language: "A person is prevented from resisting if he or she is so intoxicated that he or she cannot give legal consent. In order to give legal consent a person must be able to exercise reasonable judgment. In other words, the person must be able to understand and weigh the physical nature of the act, its moral character, and probable consequences. *Legal consent is consent given freely and voluntarily by someone who knows the nature of the act involved.* If the victim is so unsound of mind that she is incapable of giving legal consent, the fact that she may have given actual consent is not a defense."

Defendant argues the instructions are incomplete under *People v. Giardino*, *supra,* 82 Cal.App.4th 454 because they erroneously "omitted an aspect of the definition that was critical to the defense: that the jury could consider whether [E.L.] was capable of positively cooperating in act or attitude to the sexual acts, pursuant to an exercise of free will," an aspect of

37

consent he contends is broader than the definition given to the jury. In addition to arguing the merits, the People argue this issue has been forfeited.

It is unnecessary to resolve whether defense counsel's failure to request an appropriate instruction forfeited the claim, because we conclude there was no error. Defendant's argument rests on an overbroad reading of *Giardino*, a case that actually supports the instruction given here.

In *Giardino*, which was also a prosecution for rape and oral copulation by intoxication, the jury was instructed solely in the language of the statute defining the offense (i.e., that the victim "was prevented from resisting the act by an intoxicating substance") but, unlike here, given no definition of what "prevented from resisting" means. (*Giardino*, *supra*, 82 Cal.App.4th at p. 464.) The jury asked for clarification of that concept and was told only to use its " 'common sense and experience.' " (*Ibid*.) The appellate court reversed.

*Giardino* held first, that "prevented from resisting" refers to the victim's powers of judgment rather than his or her physical ability to resist and means simply the victim lacks the capacity to give legal consent due to intoxication. (See *Giardino*, *supra*, 82 Cal.App.4th at pp. 461-465.) It rejected a narrow construction of that concept that would require the victim to be so intoxicated that they could neither resist physically *nor* even speak. (*Id*. at pp. 462-463.) "The line between that extreme level of intoxication and absolute unconsciousness is very thin," it observed, and there was "no indication in our decisional law" that rape by intoxication was intended to "apply only to such severely incapacitated victims." (*Id*. at p. 463.)

Next, it held the trial court erred prejudicially by declining to clarify the meaning of "prevented from resisting" after the jury sought help.

38

(*Giardino, supra,* 82 Cal.App.4th at pp. 464-471.)  To be sure, in describing the kind of clarification that should have given, it referred to the definition of consent under section 261.6, but it did not say that an instruction using the precise statutory language of section 261.6 was required, much less that the jury should have been told specifically that consent entailed the concept that defendant says was erroneously omitted here:  i.e., that of  "positive cooperation in act or attitude pursuant to an exercise of free will."  It observed only that "the jury should have been instructed that its task was to determine whether, as a result of her level of intoxication, the victim lacked the legal capacity to give 'consent' *as that term is defined in section 261.6. Legal capacity is the ability to exercise reasonable judgment, i.e., to understand and weigh not only the physical nature of the act, but also its moral character and probable consequences.*" (*Giardino,* at p. 466, italics added.)

Here, the jury was instructed with language that precisely tracked the manner in which *Giardino* construed " 'consent' as that term is defined in section 261.6":  namely, as the ability to "exercise reasonable judgment" and "to understand and weigh the physical nature of the act, its moral character, and probable consequences."  *Giardino* required nothing more.  Indeed, the instruction here went farther, because it specifically encompassed the concept that legal consent must be "given freely and voluntarily by someone who knows the nature of the act involved," which closely tracks a portion of the statutory language.

Finally, precisely the same argument that defendant raises here was rejected by *People v. Sta Ana*, *supra,* 73 Cal.App.5th 44, published the day after the reply brief was filed in this case.  (See *id*. at pp. 61-62 [rejecting

39

argument that *Giardino* requires an instruction that legal consent means " ' "positive cooperation in act or attitude pursuant to an exercise of free will," ' " and holding the jury was properly instructed without it and defense counsel was not ineffective for failing to request it].)

For all of these reasons, the trial court did not err in failing to instruct the jury sua sponte with the language of section 261.6's first sentence.

Further, we agree with the People that any error was harmless under any standard, including beyond a reasonable doubt. Section 261.6's first sentence does not define consent merely as an act or expression of "positive cooperation" but as one that is undertaken "pursuant to an exercise of free will." Under the instructions given, however, the jury necessarily resolved the "free will" issue against defendant. (See *Lujano, supra,* 15 Cal.App.5th at p. 196; *Braslaw, supra,* 233 Cal.App.4th at p. 1246.) It found, under the instructions, that E.L. was unable to consent "freely and voluntarily" because she did not "know[] the nature of the act involved." It also found that she was "so unsound of mind that she [was] incapable of giving legal consent," *regardless* of "the fact that she may have given actual consent." Thus, had the jury found she "positive[ly] cooperat[ed]," it would not have found she did so "pursuant to an act of free will" within the meaning of section 261.6, and therefore an instruction under the statute's literal language would not have resulted in an acquittal.

## II.

### *Rape Trauma Expert Testimony*

Next, defendant challenges the admission of portions of testimony by the prosecution's rape trauma expert, Dr. Stefanie Smith, which he quotes in six pages of appellate briefing and says falls into four objectionable

categories. To put it in context, Smith's testimony totaled 36 pages out of a roughly 400-page trial transcript, and half of her testimony was on cross-examination. Most of her direct testimony (14 of 18 pages) focused on how victims react to a rape as it is happening and afterward and the effects of such reactions on memory of the events. Defendant does not contend those subjects were inappropriate.

Defense counsel interposed very few objections to the testimony challenged here, and even then, objected on grounds that arguably are not relevant to the issues raised on appeal. All of this creates significant issues as to whether most of defendant's appellate claims of error have been forfeited. Nevertheless, assuming without deciding that they were not forfeited, we reject these claims on the merits.[26]

It is a "well-established rule that we review a trial court's ruling 'excluding or admitting expert testimony for abuse of discretion.' " (*Lowery v. Kindred Healthcare Operating, Inc.* (2020) 49 Cal.App.5th 119, 124 (*Lowery*).) With that in mind, we consider each claim of error.

---

[26] Defendant filed an unopposed motion on February 8, 2021, to augment the record with copies of an email the prosecutor sent to defense counsel about Smith's anticipated testimony, and defense counsel's responsive email to the trial court requesting a hearing to limit the scope of her testimony. Defendant argues the emails provide context for his objections to the expert's testimony and the purpose for which the prosecution sought to introduce her testimony. Although we are not addressing the adequacy of defendant's objections, we now grant the unopposed motion to ensure that there is a complete record on this subject, and the record is hereby deemed augmented to include the two emails (both dated July 25, 2019).

## A. Testimony About a Rape Victim's Post-Incident Symptoms and Conduct

The first area of Smith's testimony defendant challenges is testimony the prosecutor elicited "about how someone who was truly raped will react, if this person suffers from rape trauma." Defendant does not specify the particular testimony he says falls into this category or provide a record citation, but his brief refers to Smith's testimony "that dropping out of school and suffering from anxiety are consistent with suffering from rape trauma."

Thus, we understand the argument to be directed at the following portions of Smith's testimony quoted in the opening brief, which were elicited by the prosecutor on direct examination and redirect examination. In setting out the challenged testimony, we also quote relevant portions of Smith's testimony on cross-examination for context.

On direct examination, the prosecutor elicited the following testimony now challenged on appeal:

"Q. So we've talked about typical responses that might happen during a rape. What are the typical responses to sexual trauma or rape after the incident?

"A. So, again, wide variety, but most commonly you would get probably some changes in behavior. You always look for a change in behavior. And so it—often with rape it's that not trusting individuals, being scared, you might lock doors more, avoid the place that it happened. Often you might try maybe to go to work or school and then after a while you realize it's not working and you just stop going. Most of the clients I've had, yeah, they've pretty much just stopped their life. They're no longer going to school. They're no longer working. Relationships, you're less likely to engage in relationships. In terms of sexual activity that can run the gamut. Either you

42

no longer want to have sex or you try to have sex a lot in order to try to get control of it, like I'm going to be in charge rather it done to me, so that runs the gamut.  If you had a way you used to cope you'll probably use that more, whether it was healthy or not healthy.  So you might exercise a lot, talk to friends or if you drank you'll start drinking even more."

That was the extent of testimony elicited on direct examination. Defense counsel then explored the subject at the end of cross-examination:

"Q.  Now, a person who is the victim of a sexual assault and has experienced trauma—just to be clear, there is a wide variety of things you would see in that person and how they present externally; right?

"A.  Yes.

"Q.  So, for example, you said someone might want to start having sex right away?

"A.  Correct.

"Q.  Some people would say, I'm never having sex again?

"A.  Correct.

"Q.  Some people become shy or withdrawn about the event?

"A.  Yes; correct.

"Q.  Some people want to talk about it?  Some people want to give talks and give speeches?

"A.  Yes.

"Q.  Same thing with sort of how they go about their lives with work, with family relationships.  Some people can't manage those after a traumatic event?

"A.  Correct.

"Q. Some people pour themselves into their work and into their family relationships; right?

"A. Yes.

"Q. In other words, how you act after a traumatic event does not demonstrate whether the traumatic event occurred?

"A. Not the specifics, but you would be looking for a change. And that change can signal that a traumatic event occurred.

"Q. So if someone drinks to excess you'd expect—I thought you said they might continue to drink to excess or they might stop drinking?

"A. The change may not be specific to something that was during the trauma, but you would see a change in how they're—yeah, how they go about the world."

"[DEFENSE COUNSEL]: Thank you, Your Honor. Nothing further at this time."

On redirect examination, the prosecutor elicited the following testimony which defendant also now challenges on appeal:

"Q. Would dropping out of school be a consistent response with someone who experienced trauma?

"A. Yes.

"Q. Would having trust issues and anxiety be a consistent response to someone who experienced trauma?

"A. Yes.

"Q. Would changing bedrooms be a consistent response to someone who may have been traumatized in their own room?

"A. That would be a huge red flag.

In closing argument, the prosecutor referred to this aspect of Smith's testimony in the following context, and we italicize those portions of the argument defendant now contends are objectionable:

"Let's not blame the victim here.  Let's be different.  Because no matter what [E.L.] would have said, the Defense would have found a way to critique it.  If she cried she's lying.  If she doesn't cry it's because she's lying.  If she tells the same story it's because she's rehearsed it because she's practiced because she reviewed her statement.  If she modifies it that's a lie too.

"Inconsistencies are human.  Inconsistencies within one person's story, between witnesses' stories, it's human.  You can't repeat the same story the same way with the same delivery every single time, especially when that story is about the worst, worst day of your life when you have memories that you wish you could forget but can't and others that you wish you had but don't.

"And we heard from Dr. Smith that the nature of the trauma makes inconsistencies understandable.  We remember things in bits and pieces.  Labeling [E.L.] a liar because of her inconsistencies is just wrong.  It misunderstands what trauma really is.

"*So let's look at [E.L.'s] trauma.  She is consistent with what Dr. Smith testified about.  She remembers it in bits and pieces.  Dr. Smith said that when you are experiencing a traumatic injury there's so much of the stress hormone cortisol in your body that your brain can't function the way it normally does.  She gave an analogy of Post-it notes.  Your Post-it notes are everywhere and those are your memories.  You have them in different parts of your brain and because of that you can't tell a straight story.  You can't say*

45

*how something started and ended. You can't give a sequence. And [E.L.]*
*presented all of that.*

"Dr. Smith talked about dissociation, how during a traumatic event you feel like you're in a dream. It feels surreal because your body has disconnected from what's happening. That you might be unable to move and you also might recall new memories later on. That's all consistent with Dr. Smith and her testimony about trauma.

*"Now, let's look at the evidence of trauma after this incident. [E.L.] said she suffers from anxiety. She has trust issues with everyone. I asked her, 'Did you lock your bedroom door that night? No. But I do now.' She had to change her bedroom. She had to get new furniture. All of those are consistent with trauma, somebody who cannot cope with this incident in a normal way. [¶] But what's not up here, which is the most obvious sign of her trauma, the most unfortunate result of what happened, is that [E.L.] dropped out of school. She can't even go to college anymore because she's so traumatized from what happened to her a year ago. Think about all these things and ask yourself, is this consistent with someone who is exaggerating, who is making this up? Why would [E.L.] drop out of school, change her bedroom, change her furniture, lock her doors if this is all a misunderstanding?"*

Defendant asserts that the above-quoted testimony elicited by the prosecutor was inadmissible because it was used in closing argument for the specific purpose of arguing that E.L. must have been raped because she exhibited symptoms of rape trauma. Such a purpose, he argues, is foreclosed by *People v. Bledsoe* (1984) 36 Cal.3d 236 (*Bledsoe*) and its progeny. (See, e.g., *People v. Clotfelter* (2021) 65 Cal.App.5th 30, 64-65 (*Clotfelter*).)

46

As we have summarized: "[I]t is well established in California that rape trauma syndrome evidence is admissible to rebut the inference that an alleged rape did not take place due to conduct portrayed as inconsistent with the victim having been raped. As our Supreme Court has unanimously declared, in an appropriate context 'expert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths.' " ([*Bledsoe, supra,*] 36 Cal.3d [at pp.] 247-248; accord, [Citations]." (*Jennifer K. v. Shane K.* (2020) 47 Cal.App.5th 558, 585.)

But such evidence cannot be used to prove that a sexual assault, in fact, took place. (See *Bledsoe, supra*, 36 Cal.3d at p. 251.) As we recently explained in a case involving Child Abuse Sexual Accommodation Syndrome which is governed by the same legal standard, expert testimony may not lead the jury to conclude that *because* the complaining witness exhibits the same behavior as a class of actual victims of sexual abuse, the complaining witness was in fact sexually abused. (*Clotfelter, supra*, 65 Cal.App.5th at p. 64.) " '[P]ermitting a person in the role of an expert to suggest that because the complainant exhibits some of the symptoms of rape trauma syndrome, the victim was therefore raped, unfairly prejudices the appellant by creating an aura of special reliability and trustworthiness.' " (*Bledsoe*, at p. 251.)

Extended discussion is unnecessary here. We agree that the challenged testimony exceeded the permissible limits of rape trauma evidence under *Bledsoe*. Indeed, there can be no dispute that Smith's challenged testimony that various changes in behavior are consistent with having experienced trauma (such as dropping out of school, changing bedrooms and experiencing

47

trust issues) was *not* offered for the permissible purpose of rehabilitating E.L.'s credibility in this case. Such testimony had no logical bearing on her credibility as a witness; that is to say, it had nothing to do with whether her testimony should be believed despite her having dropped out of school, changed bedrooms and so forth. Rather, its sole purpose was to lend "an aura of special reliability and trustworthiness" to the notion that because E.L. exhibited these symptoms, she had in fact been raped (see *Bledsoe*, *supra*, 36 Cal.3d at p. 251), which is precisely what the prosecutor argued to the jury immediately after asserting that *other* aspects of E.L.'s testimony were "consistent with" Dr. Smith's testimony about trauma.

But, as we will explain, and as in *Bledsoe* itself, the error here was harmless. (See, e.g., *Bledsoe*, *supra*, 36 Cal.3d at pp. 251-252 [erroneous admission of similar evidence held harmless]; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 180 (*Lapenias*).) It is not reasonably probable that defendant would have achieved a more favorable outcome at trial had the trial court excluded Smith's testimony about these various manifestations of trauma. (See *Bledsoe*, at pp. 251-252 [applying *Watson*[27] standard]; *Lapenias*, at p. 180 [doing same and holding *Chapman* standard inapplicable].)

To start, Smith's testimony about such symptoms of trauma occupied a very minor role in the case. Her testimony in its entirety was brief, and the majority of it was for the permissible use of addressing the effects of trauma on E.L.'s memory. The impermissible part of her testimony on direct and redirect examination about typical symptoms of rape trauma consumed fewer than two pages. Nor was the impermissible part of the testimony the

---

[27] *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

primary focus of the prosecutor's closing argument (indeed, the subject was not brought up on rebuttal). Rather, the prosecutor in closing argument repeatedly stressed the instruction that the jury could convict defendant on the basis of E.L.'s testimony *alone*, along with the fact she had no motive to lie and thereby subject herself (and her family) to the embarrassing and arduous ordeal of a public prosecution. As the prosecutor put it at one point, "[w]hen you really think about this case it comes down to . . . three points: Was she so intoxicated? Was she unconscious? *Do you believe her*?" (Italics added.) No juror asked Smith any questions about rape trauma symptoms.[28] During deliberations, the jury did not request a readback of any of her testimony. And although, as in *Bledsoe*, the rape trauma testimony should not have been admitted, it did little more than tell the jury what it already knew: that someone who experiences rape would experience traumatic after-effects. (See *Bledsoe*, *supra,* 36 Cal.3d at p. 252.)

Second, the prosecution's case was strong; we do not agree with defendant's characterization of this case as "a textbook close case." E.L. testified she was so drunk when she arrived home she was blacking out.

---

[28] The jury asked no questions during deliberations. Of twelve written questions that various jurors submitted to witnesses, three were directed to Smith.

Juror number 5 asked: "Is there research supporting your comments about different outcomes based on whether events actually happened that are based on situations where the truth of the patient's belief is known? [¶] [As opposed to patients you treat, where you don't have objective knowledge of the event, per defense counsel's questions.]"

Another juror asked two questions: one, "[c]an functionality of the hippocampus be affected by physical impact? (impact to face) If yes, how does that affect memory and any perceived reality," and two, "[c]an fabrication/manipulation of memories be a coping mechanism? Re: shame."

And, more to the point, her *visibly* incapacitated state was corroborated by all three percipient witnesses who encountered her in that timeframe: her two parents, each of whom described her as heavily intoxicated and testified in substance that when they tried to interact with her, she was incoherent and incapable of tracking conversation; and her brother, who overheard her mumbling and fumbling and said that her text to him made no sense. Her inability to carry on a cogent conversation also was corroborated by her friend Samantha, who described the earlier drunken phone call (of which E.L. herself had no memory) in which E.L. talked nonsense about joining up with Samantha. And the uncontradicted testimony established that when E.L. arrived home, she was too drunk to function. She could not walk from the car without wobbling; climb the stairs without her father's help; walk into the house without draping herself on her mother's body as her mother clutched her by the waist to help her stay upright; undress herself; settle herself in bed without flopping herself from one bed (her own) to another; or even respond when asked repeatedly if she wanted water—including when asked by defendant, which indicates he *knew* she was in bad shape. His knowledge of that fact was evidenced, too, by the very fact he felt compelled to call her father (repeatedly) in the dead of night as they were driving home to alert him about his daughter's situation. The conversation was so concerning, it prompted her father to check his daughter's location using GPS tracking and to call her himself (and she did not answer his call—and a reasonable inference the jury could draw is that when she drunkenly missed the phone call and then drunkenly called her father back, defendant would have observed this). E.L.'s mother testified defendant told her she was already drunk when he encountered her. He also watched her mother help her get

50

into bed and place a trashcan by her bedside in case she got physically sick. E.L. had *no* cogent conversation with anyone when she got home; all she could communicate were drunken expressions of affection for her mother. The expert toxicologist corroborated the percipient witnesses, moreover, because he testified that cognitive impairment would have been possible at her blood alcohol level that night (i.e., nearly three times the legal limit), and that a person's difficulty in making judgments due to the effects of alcohol would be outwardly apparent to others. In addition, defendant had just finished medical school, and so a jury might reasonably infer either that he *should have known* she was cognitively impaired based on the way she was acting at that point in the night or that, based on his medical training, he actually knew that. Neither of the two defense witnesses, moreover, shed any light on E.L.'s cognitive functioning at the time she arrived home. Furthermore, defense counsel expressly acknowledged during closing arguments that E.L. was too impaired "to perceive everything that's happening."[29] He also conceded that, on the way home in the car, "there's no doubt about it. She's intoxicated." In sum, the evidence that, immediately

---

[29] The context for this concession was an attack on E.L.'s reliability. Defense counsel argued: "We have to rely on [E.L.] to get beyond a reasonable doubt. We have to be able to rely on her. So has she given the good, high-quality evidence we can rely on? In other words, can you be sure in your minds and in your hearts that she was truthful about everything, got it all right and was a good historian of events that night? The answer is no and it's not even close. And it's not even close. *If you want to know what happened that night you can't just ask [E.L.] because she got a number of things wrong. And this is just the nature of the human mind. When you're* [sic] *decide to get drunk, when you decide to use drugs you're not going to be able to perceive everything that's happening.* That's okay, but we can't rely on [E.L.] to get to proof beyond a reasonable doubt." (Italics added.)

before defendant had sex with her, E.L. was visibly extremely intoxicated and incoherent, and that this was readily apparent to him, was uncontradicted.

And that is not all. In the undisputed circumstances, it also was highly improbable that E.L. would have wanted to have sex with defendant that night had she been in a position to exercise reasonable judgment. Not only was her entire family within close physical proximity (and her brother within earshot) when the first sexual encounter took place, but as defense counsel conceded during closing argument, many people, perhaps most, would not willingly have sex with a cousin or an uncle.[30] Indeed, defense counsel conceded that the sexual encounter was traumatic for E.L., because "it wasn't what she would have wanted had she been sober." "And this is the big thing[,]" he continued, *"[s]he could really, really feel like that's not what she wanted to happen and still really, really, really not know what happened actually because she herself got so voluntarily drunk and high."* (Italics added.) When someone "really, really" "[does] not want[]" to have sex with a family member but does it anyway while highly intoxicated, the logical inference is that person was not able to appreciate the nature of the acts he or she was engaging in.

Three other facts contribute to the strength of this case. The first is that E.L. came forward the very next morning and told her friend Samantha about the assault and then visited the hospital to obtain a SART examination (which she completed the next day), and two days after the assault she told

---

[30] He argued to the jury: "One place that I don't think anyone will have a dispute is nobody wants to have sex with their second cousin. *Nobody in their sober mind would want to have sex with their second cousin."* (Italics added.) Moments later, he told the jury again that E.L. "doesn't remember what happened or what role she played, but *in a sober mind she wouldn't have made the same mistakes . . . ."* (Italics added.)

her mother and father what had occurred. Second, DNA evidence corroborated that the sexual acts took place. And third, there are E.L.'s bruises, documented by the nurse at the clinic. The photographs depict that the back of E.L.'s right arm was discolored with large visible bruises (from just below her elbow all the way up to her shoulder), and her left arm appears only slightly less injured (with just one bruise, but equally discolored). The back of one of her thighs is visibly bruised too. Defense counsel conceded in closing argument the bruises were inexplicable: he told the jury E.L. "has no concept of where these bruises took place *and neither do we. There's no evidence.*" (Italics added.) Yet the prosecutor urged the jury to "look at those pictures with every bit of detail" during its deliberations, and that the position of the bruising was consistent with defendant having forcefully "manipulat[ed] her limp body to have sex with him."

Finally, there also was defendant's very short and clipped Facebook message to E.L. in the days following their encounter, where he asked, "How are you?" and insisted, "We have to talk." That piece of evidence standing alone of course is not dispositive. But the most reasonable inference (if not the only one) was that defendant quickly was conscious of having taken advantage of his cousin's drunken condition even if, at the time, he had been either willfully ignorant (or too drunk himself[31]) to see she was in no

---

[31] Intoxication does not negate the mental state required for rape of an intoxicated person, which is a general intent crime. (See *Braslaw, supra,* 233 Cal.App.4th at p. 1250.) Although defendant was clearly much more sober than E.L. when he engaged in sex with her (both of her parents testified he was coherent, functional and didn't appear to be intoxicated), there was certainly an evidentiary basis to conclude his inhibitions might have been lowered. He had himself engaged in a long night of drinking and drug use and, indeed, asked for and was given more alcohol when he brought E.L. home; E.L.'s father even put him at a five or six on an intoxication scale

condition to agree to have sex with an older relative, and to do so right under the noses of her sleeping family.

In short, while we would not describe this as an open-and-shut case, we also would not describe it as "a textbook close case."

Against this backdrop, and by contrast, the evidence defendant cites in his appellate brief that he says creates reasonable doubt is weak (and in some instances defendant overstates the actual evidence).[32]  He asserts that such evidence "includes that [E.L.] was functional" and "making logical decisions"—which we take to mean, she was capable of doing things like recording videos at John Collins and sending a text to her brother, as was argued below to the jury.  But the text exchange with her brother took place before the bar stopped serving drinks, concluded 45 minutes before she got home and even then was partly gibberish; it is evidence of her *impaired* cognitive functioning, not the opposite.  And, as we have explained (and defense counsel acknowledged), her condition while still at John Collins is not probative of her condition in the moments immediately before defendant had sex with her at 2:30 a.m. after a long night of heavy drinking and drug use. Defendant also asserts, "She did not appear [to defendant] to be fumbling" at some unspecified point in time; but clearly, by the time she arrived home she *was* fumbling, as both her parents observed.  Defendant asserts she "did not throw up, did not appear to be unconscious [and] was able to walk upstairs

_____

of one to ten when he arrived at their home; and there was expert testimony that alcohol consumption can result in a loss of inhibitions.

[32]  Defendant says that evidence is summarized in "Section II.B." of the opening brief but there is no such section.  We presume this refers to "Section II" of the opening brief which summarizes the testimony of defendant's  two friends, Ben and Jonathan.

54

without a problem"; the latter point misstates the record (her father testified he had to help her up the stairs).  And the fact she didn't manifest symptoms of even more extreme intoxication (such as throwing up immediately or passing out) is not relevant; the test of legal incapacity does not require the victim to be so intoxicated that they're actually (or even nearly) unconscious. (See *Giardino*, *supra*, 82 Cal.App.4th at p. 463.)  Likewise, the fact she did not actually throw up until the following day does not detract from evidence that she was so visibly intoxicated that night that one witness (her mother) thought she *might* throw up and another (her brother) thought she was actually doing so.  Finally, defendant points to evidence that he "stayed at the house and kissed [E.L.] when he would have known she was sober"; such evidence bears on his subjective belief the previous night's sexual encounter had been consensual, but ultimately is of little relevance.  It does not have any logical bearing on whether any subjective belief he might have had concerning her capacity to consent to the sex was *reasonable*.  (See, e.g., *Braslaw*, *supra*, 233 Cal.App.4th at p. 1245 ["[W]hether defendant believed [the victim] was consenting to intercourse . . . is irrelevant if he did not also reasonably believe she was *capable of giving consent* to intercourse despite her intoxication.  It is a reasonable belief in the victim's capacity to consent, not the consent, that provides a defense to rape of an intoxicated person"].)

Here, as in *Bledsoe*, "[a]lthough the defense was able to cast doubt on some of [the victim's] testimony" around the margins (such as whether there was violent hitting) and the jury ultimately rejected one aspect of the prosecution's theory (i.e., it found that she was not too *intoxicated* to consent

55

the following morning),[33] it believed the overall substance of her account (which is that in the middle of the night she was too incapacitated to consent, and the following morning did not consent) and, moreover, "the defense was never able to suggest any plausible, innocent explanation for [the victim's] bruises and emotional trauma." (*Bledsoe, supra,* 36 Cal.3d at p. 252.)

The jury also did not deliberate for very long. Defendant says "the jury deliberated for four days, which suggests that they struggled with whether to convict." But that is incorrect. As our recitation above indicates, after the first day and a half, a juror was excused for refusing to follow the law. Once that juror was excused and the jury was told to start deliberations anew with his replacement, the jury deliberated for just one day to reach its verdict. In that fairly short amount of time, it had nine counts to sort out, covering two distinct incidents, each one charged under multiple, alternative theories. In short, the jury had a lot to sort out, and it is not remarkable this took about a day.

In sum, it is not reasonably probable that defendant would have obtained a more favorable outcome but for the erroneous admission of

---

[33] The jury's verdict on the "morning after" charges did not reject any aspect of E.L.'s testimony. Unlike the events of the night before, she did not testify that she was too intoxicated to realize what was going on or exercise reasoned judgment the following morning. She merely testified she still felt drunk but now had no trouble walking and that she protested his sexual advances by (twice) recoiling from his touching. Even the prosecutor basically conceded she was not too drunk to consent in the morning, arguing that, "He raped her, plain and simple. He performed all of those sex acts against her will. *She did not have the ability to consent. And when she did she absolutely did not.*" (Italics added.) And defendant's conviction on two counts of non-consensual sexual contact shows that the jury *believed* her.

Smith's testimony about various behaviors that are consistent with rape trauma.

For similar reasons, its admission did not "so fatally infect[] the proceedings as to render them fundamentally unfair" in violation of federal due process. (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 919; see also *People v. Fuiava* (2012) 53 Cal.4th 622, 696 [due process clause is violated " '[o]nly when evidence "is so extremely unfair that its admission violates fundamental conceptions of justice" ' "].) Furthermore, Smith's erroneously admitted testimony "was not highly inflammatory but relatively sterile." (*Jammal*, at p. 920.) And it was brief. It was not " 'of such quality as necessarily prevents a fair trial.' " (*Ibid.*) "That state law does not permit the introduction of such evidence makes no difference for purpose[s] of our constitutional analysis. [Defendant] got a fundamentally fair trial." (*Id.* at p. 921.)

### B.    Testimony About the Incidence of False Rape Claims

Next, defendant challenges a portion of Smith's testimony on redirect examination that of the "hundreds of patients" she had treated, she was aware of only one or two who had convinced themselves they had been sexually assaulted. That testimony is accurately quoted in full context in the opening brief and the respondent's brief. The prosecutor elicited the challenged testimony after Smith was cross-examined extensively about whether the trauma symptoms of someone who merely believed (falsely) they had been sexually assaulted would be similar to those of an actual sexual assault victim; Dr. Smith at times had difficulty answering defense counsel's questions because she had little experience with people who had simply convinced themselves they'd been victimized. And so on redirect

57

examination, the prosecutor asked for clarification, which is when she testified that she had "struggle[d]" with the line of cross-examination because she didn't have much experience with that phenomenon, and had only seen this "one or two times."

Defendant argues such testimony was erroneously admitted because it amounted to impermissible expert opinion evidence about the statistical infrequency of false allegations of rape, which invades the jury's province for judging witness credibility in violation of both state law and federal due process. (See *People v. Julian* (2019) 34 Cal.App.5th 878, 885-887 (*Julian*) [due process violation to admit expert testimony that false allegations of child sexual abuse " 'don't happen very often,' " and occur only in about one to eight percent of cases]; *People v. Wilson* (2019) 33 Cal.App.5th 559, 568-571 (*Wilson*) [admission of similar evidence held erroneous under state law]; see also *Lapenias*, *supra*, 67 Cal.App.5th at pp. 178-180 [state law error to admit expert testimony that it is "rare" for children to make false allegations of sexual abuse even expert did not statistically quantify the infrequency].)

There was no error. In context, Smith's challenged testimony about the small number of patients she'd treated who merely believed they had been sexually assaulted was not offered as an expert opinion about the infrequency of false claims of rape, much less was it offered to vouch for E.L.'s credibility in this case or to corroborate her claims. It was elicited on redirect examination after *defense counsel* had injected the issue of false allegations during cross-examination, as the reason Smith was having a difficult time answering defense counsel's questions on the subject.[34] Indeed, the

[34] For example, at one point defense counsel asked: "Q. . . . I'm wondering what happens when the belief about what happened overwhelms your body, your ability to cope with it because your belief is so strong that

prosecutor was struggling too; she began this line of redirect examination by stating she needed "a little bit of clarification" and was "a little confused." And then after the prosecutor had elicited the challenged testimony in an effort to clear up the confusion, Smith disavowed any expertise on the subject of false allegations:  in response to two different questions (one from a juror and a follow-up question from defense counsel), she testified she was not familiar with any research on people who genuinely believed (falsely) they had been victimized, because it was a topic beyond the scope of her expertise. In context, it is inconceivable the jury would have understood the prosecution to be offering her testimony as an expert opinion about the statistical infrequency of false allegations of rape.  We simply do not agree that her testimony was offered to "predict[] the likelihood that [E.L.] was telling the truth by informing the jury that only one or two of hundreds of persons she has seen suffering from rape trauma were not actually raped."  Nor was she offering an opinion outside the scope of her expertise; she testified about *facts* (i.e., about patients she had treated).  Defendant's arguments take her testimony entirely out of context.  Her very brief testimony about her own clients was not offered as statistical evidence of the probability of defendant's

---

something bad happened to you whether or not it actually did?," to which she responded, "I would find it really unusual for a belief to have that impact. I've only seen it have that impact in psychotic individuals."  In response to a follow-up question, she testified that she doesn't take "at face value" everything a patient reports to her but instead asks questions and "wonder[s] about their stories," and that "I have had clients where I think some of the events happened and I think some of the events they have told me did not and I come to that based on conversations we've had and as therapy goes on."

59

guilt and is not akin to the type of expert opinion evidence about the infrequency of false claims held improper in *Julian*, *Wilson* and *Lapenias*.[35]

For the same reasons, we also find no due process violation. (See, e.g., *People v. Phillips* (2022) 75 Cal.App.5th 643, 686 [concluding "[f]or the same reasons we find no state law error" that the admission of challenged testimony did not deprive defendant of a fair trial in violation of his federal constitutional rights]; *People v. Jones* (2013) 57 Cal.4th 899, 949 [" 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair' "]; *Lapenias*, *supra*, 67 Cal.App.5th at p. 174 ["Generally, a court's compliance with the rules of evidence does not violate a defendant's right to due process"]; accord, *People v. Lopez* (2022) 78 Cal.App.5th 459, 464, fn. 7.)

And, here again, any error was harmless. (See *Collins, supra,* 68 Cal.2d at pp. 332-333 [applying *Watson* standard to erroneously admitted statistical probability evidence]; *Wilson*, *supra*, 33 Cal.App.5th at pp. 571-572 [doing same and holding *Chapman* inapplicable].) As explained above, the prosecution's case was strong. Furthermore the challenged testimony was extremely brief; Smith openly acknowledged her own lack of expertise on the subject of false allegations; the jury was instructed it could discount an expert's testimony for that very reason[36]; in closing argument the prosecutor

---

[35] It is even less similar to the expert statistical probability evidence held improper in *People v. Collins* (1968) 68 Cal.2d 319 (*Collins*), which involved complicated expert testimony by a mathematician in a case where the two perpetrators' identities were at issue that was aimed at assessing the low likelihood of a random couple possessing the perpetrators' distinguishing characteristics, but was flawed in both logic and an adequate evidentiary foundation yet was central to the prosecution's case.

[36] The jury was instructed: "Witnesses are allowed to testify as experts and to give opinions. You must consider the opinions but you are not

did not discuss her testimony about the two patients she could think of where this was an issue, nor even come anywhere near the subject of predictive probabilities; and the jury was instructed that it was the sole judge of the facts and the credibility of witnesses. And, of course, E.L. testified extensively and the jury could assess her credibility for itself. Two of the three cases involving error of this claimed nature held such errors to be harmless for similar reasons. (Compare *Wilson*, *supra*, 33 Cal.App.5th at p. 572 [error harmless]; *Lapenias*, *supra*, 67 Cal.App.5th at p. 180 [same, even though prosecutor discussed erroneously admitted probability testimony in closing argument] with *Julian*, *supra*, 24 Cal.App.5th at pp. 888-889 [admission of statistical probability evidence held highly prejudicial in "a heavily contested case with strong defense evidence," prosecution conceded complaining witness had serious credibility issues, prosecutor relied on it in closing argument and jury's attention was directed to it immediately before it began deliberations].) In sum, it is not reasonably probable defendant would have received a more favorable result had Smith not testified that only two of her patients had experienced rape trauma based on a mere belief they had been victimized. Were this issue governed by *Chapman*, we would conclude the same thing beyond a reasonable doubt. We are certain in the circumstances that Smith's very brief testimony in this area did not at all

required to accept them as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, *consider the expert's knowledge, skill, experience, training and education, the reasons . . . the expert gave for any opinion and the facts or information on which the expert relied in reaching that opinion.* You must decide whether information on which the expert relied was true and accurate. *You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.*" (Italics added.)

"distract" the jury from deciding whether *this* victim had falsely accused defendant of sexual assault.

### C.    Testimony About Alcohol Consumption

Next, defendant argues that Smith was erroneously allowed to testify to the following opinions about alcohol consumption:  that alcohol and rape "go together so often, especially when it's an acquaintance rape"; that several studies specifically addressed the impact of alcohol on the memory of rape victims and "found that while there will be an increased instance of not remembers there's no difference in [the] accuracy of the memory that [victims] actually recall"; and later, after she had been qualified as an expert, that the research she had previously alluded to concerning alcohol and sexual trauma "found that you're more likely to not remember pieces of [the sexual trauma]" when alcohol is involved but "[i]t just doesn't seem to impact as much the actual details of the memory you do remember."[37]  Defendant argues all of this testimony was admitted for the improper purpose of proving that it was more likely that the sexual intercourse was non-consensual because it happened between acquaintances after drinking, which is not the proper subject of expert testimony.  He also argues, alternatively, that Smith was unqualified to render opinions about the frequency of date rape coinciding with alcohol consumption or the impact of alcohol on memory.

---

[37]  We do not understand defendant to challenge the admission of Smith's immediately following testimony, elaborating on that point.  She explained:  "And alcohol in itself impacts your ability to remember details, orders, things like that.  What sometimes happens in an assault, though, is if you're in like a complete—like if you're really drunk and you can't remember things and are not clear about what's happening, at a moment of fear, all of a sudden you can kind of clear up and remember that piece.  So you cannot remember a whole event but you'll remember one really scary event in the middle of that alcohol-fueled state."

First, the trial court did not abuse its discretion in allowing this testimony.

As for the claim that it was admitted for an improper purpose, we agree with the People's argument that none of the challenged testimony was introduced to establish that alcohol consumption may lead to non-consensual sex, nor was it used for that purpose by the prosecutor (who said nothing in closing argument about the role of alcohol in sexual assault). Rather, as the recitation of Smith's testimony in the respondent's brief makes clear, Smith's expert opinions about alcohol were directed solely to the impact of alcohol on memory, particularly in the area of sexual assault. Nothing in *Bledsoe* suggests a trial court lacks discretion to permit expert testimony addressing whether alcohol consumption does or does not contribute to impaired memory of the details of sexual assault; on the contrary, expert testimony about the impact of alcohol consumption on memory is part of the longstanding fabric of criminal law (see, e.g., *People v. Balderas* (1985) 41 Cal.3d 144, 191 ["Evidence of . . . alcohol use is not admissible to impeach perception or memory *unless there is expert testimony on the probable effect of such use on those faculties,*" italics added].)

Likewise, Smith's very brief comment that alcohol and rape frequently "go together" also was not offered for the improper purpose defendant attributes to that testimony. It was simply a fact Smith volunteered on voir dire to explain why she had expertise in the area of alcohol's impacts on memory of trauma, from having treated many victims of sexual assault where alcohol was involved. In other words, that aspect of her challenged testimony was not offered as an expert opinion to assist the trier of fact in assessing guilt or innocence or credibility. It was simply a background fact

63

elicited to establish her expertise in the relevant area.  Again, nothing in *Bledsoe* prohibits the use of such testimony for such a purpose.  Cases in which expert testimony was properly excluded because it concerned a subject within the common experience of laypeople, which defendant cites, likewise do not support his position.  (See *People v. Sandoval* (2008) 164 Cal.App.4th 994, 999-1003 [expert testimony about "make-up sex"]; Evid. Code, § 801, subd. (a).)

As for the contention Smith was unqualified to render various opinions about the impact of alcohol on memory, defendant also has not demonstrated an abuse of discretion.  In the authority he cites, our colleagues in Division Four *affirmed* a trial court's exercise of discretion on the facts before it.  (*Lowery, supra,* 49 Cal.App.5th 119, 124.)

*Lowery* addressed two issues, neither relevant here.  One was whether the trial court abused its discretion in excluding a declaration setting forth the opinion of a medical expert because he did not explain the basis for his opinion and so it lacked evidentiary value (see *Lowery, supra,* 49 Cal.App.5th at pp. 124-125)—which is not a claim that defendant asserts here.  The other, which was a separate and independent ground for affirming the trial court's ruling, was whether the court abused its discretion in ruling that the doctor's field of expertise (physical medicine) did not relate to the matters upon which he gave an opinion (neurology) (see *id*. at p. 125; Evid. Code, § 720.)  That the court did not abuse its discretion in refusing to qualify the expert in that case does not establish the trial court had *no* discretion in this case to deem Smith qualified to opine on the intersection of alcohol and sexual trauma.

An appellate court must uphold a trial court's ruling qualifying an expert "unless ' " 'the evidence shows that a witness *clearly lacks* qualification

64

as an expert' " ' " in the relevant area. (*People v. Dowl* (2013) 57 Cal.4th 1079, 1089; see, e.g., *People v. Hogan* (1982) 31 Cal.3d 815, 852-853 [abuse of discretion to qualify witness as expert with *no* formal training or education in the subject matter and whose "qualifications boiled down to" having observed things that were admittedly obvious to anyone], disapproved on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771, 836.)

The record does not show that here. Smith testified on voir dire that she had been a clinical psychologist for 17 years, with a bachelor's degree in psychology and English from Georgetown University, a master's degree in education from Stanford University, and a Ph.D. in clinical psychology from the University of Connecticut; she also did two years of postdoctoral training at a trauma center in Boston working under leaders in the field. She had treated "well over" 200 patients during her career, possibly as many as 300. She had studied the psychology of trauma for around 20 years, did independent research in the area involving an estimated several hundred other trauma patients (not her own) and had started to publish in the area of the neurophysiological impact of trauma. She stayed regularly abreast in her field by attending workshops, lectures and continuing education classes to maintain her professional license ("CEUs") and presenting at conferences and in peer-reviewed publications, and she is a lecturer in the UC Berkeley Extension trauma certificate program for professionals who want to specialize in trauma. Against this background, her education and knowledge specifically regarding the role of alcohol in sexual trauma consisted of her own work experience treating a significant number of patients who were sexual assault victims in situations involving alcohol, independent reading and research on the subject, continuing education classes, and lectures and

65

workshops addressing the interplay of date rape and alcohol. Moreover, unlike the subject of false allegations of sexual assault where, as just discussed, Smith quite candidly acknowledged the limitations of her expertise, she did not disavow that the subject of alcohol as it relates to sexual trauma was beyond the scope of her expertise but, on the contrary, demonstrated familiarity with the academic scholarship in this area. Although Smith's primary field of study and experience was in rape trauma and she had less expertise regarding the intersection of alcohol and sexual trauma, defendant has not shown that it was an abuse of discretion for the trial court to conclude on this record that she was sufficiently qualified on the latter to opine on the subject. The evidence does not show she clearly lacked such expertise. (See, e.g., *People v. Chavez* (1985) 39 Cal.3d 823, 827-829 [even though "the matter is not entirely free from doubt," no abuse of discretion to find pathologist qualified to give rebuttal expert testimony about the effects of alcohol consumption on live people; the witness "was a medical doctor with extensive experience in forensic pathology" including analyzing postmortem blood alcohol tests and testified he was familiar with the medical literature on alcohol and its effects, and thus did not " 'clearly lack' the requisite qualifications" to offer an opinion]; see also *People v. Sta Ana*, *supra,* 73 Cal.App.5th 44, 59 [defense counsel had no basis to challenge expert qualifications of SART nurse who "made clear her testimony was based on classroom training, personally conducting dozens of SART exams, reading peer-reviewed articles during her master's program, and attending conferences"].)

Further, any error, once again, was harmless. Any technical error in allowing Smith to testify briefly about the background fact that alcohol and

66

rape frequently go together was trivial. As noted, the testimony was very brief, was elicited during voir dire, and was not discussed by the prosecutor in closing argument. Nor is it surprising Smith's testimony about the impact of alcohol on the memories of sexual assault victims was not brought up in closing argument, because it was "not particularly pertinent to the facts of this case" (*Bledsoe*, *supra*, 36 Cal.3d at p. 252 [addressing harmlessness].) That is because the defense never tried to impeach E.L. on the ground she was too intoxicated to accurately remember the details that she did. Indeed, defendant does not even address Smith's testimony on either subject in his prejudice analysis. And, finally, for the many reasons we have discussed, this case was not close. It is not reasonably probable the defendant would have obtained a more favorable result had Smith not been allowed to testify that rape and alcohol frequently go together or about the accuracy of trauma memory even when alcohol is involved.

### D. Testimony That a Rape Victim Will Acquiesce to Sexual Advances Out of Fear

Finally, defendant challenges the court's refusal to strike an answer by Smith to a hypothetical question about how an actual rape victim would react if her assailant returned for a second assault. We set out her testimony in context, and italicize the portion now challenged on appeal:

"Q. In your opinion based on your experience and your research can a rape survivor become compliant with their assailant either during or immediately after a sexual assault?

"A. Yeah. You also hear—so I said there was a wide variety of response. You have that kind of freeze, I can't move, I'm terrified versus that logically thinking, how can I get this to stop and there's often the fear that you're going to be killed. So you're trying to do anything to not get killed.

67

And if you've been raped before and not to get raped again [*sic*] so you're strategizing so it means you might kind of give in which leads to some of the shame aspect, but you're doing it in the interest of survival. . . . [I]n the amygdala hijack you're doing whatever you can to survive and get out of there. And that same thing can happen during the course of events at different times. So like I had a client where at first they were immobile and then later on in the event because the event was lasting more than one—like it was night to morning, later in the day in the morning she had a different response than she did initially.

"Q. So hypothetically based on what you were talking about if somebody were raped by their assailant and then a few hours later that assailant comes back and now they just acquiesce to the conduct, what would you take out of that?

"A. *I would take that now they know how horrible rape is. You don't really know how bad it's gonna be until it's happened and so now you're going to try to do anything to make sure it doesn't happen. So you might give in to the parts of it that you're hoping will prevent a worse part.*

"[DEFENSE COUNSEL]: Your Honor, I'm going to object to that answer as speculation, outside the scope of the witness's expertise. Ask that it be stricken.

"[THE COURT]: I think it's within her expertise. I'm going to overrule the objection." (Italics added.)

Defendant argues this testimony was not the proper subject of expert opinion and is prohibited under *Bledsoe* because its only potential relevance was to prove that E.L.'s conduct towards defendant in the morning was nonconsensual. He concedes Smith "could have phrased this opinion in an

68

admissible manner . . . [by] testif[ying] that a person *may* acquiesce to sexual contact despite having been raped a few hours prior because she is worried what might happen if she resists."  Defendant argues that the problem here, though, is that Smith "testified that she would interpret that conduct in only one way—and that way necessarily means that the interaction was nonconsensual."

We do not agree.  Smith was asked to *assume* that E.L. had been raped and so she did.  She merely testified why a rape victim in that situation might acquiesce (as she put it, "might give in to the parts of it that you're hoping will prevent a worse part").  This testimony was properly allowed, because it was clearly offered not to prove that E.L. had nonconsensual sexual contact with defendant (either at night or the next morning) but to help explain her seemingly self-impeaching behavior in acquiescing to defendant's kiss the following morning.  (See *Bledsoe*, *supra*, 36 Cal.3d at p. 247; see, e.g., *People v. Housley* (1992) 6 Cal.App.4th 947, 955-956].)

Furthermore, even assuming there was an error, it was harmless.  In substance the challenged testimony was just duplicative of Smith's immediately preceding more general testimony about rape victims sometimes becoming compliant with their assailants after an assault, but with case-specific hypothetical facts.  Further, there is no indication that this testimony had any role whatsoever in the jury's deliberations (through notes, questions or otherwise through closing arguments to the jury) and, as described above, the prosecution presented strong evidence of defendant's guilt.

### III.

### *Newly Discovered Evidence of Videos by E.L.*

One ground of defendant's motion for a new trial which, as noted, the trial court denied was that defendant had newly discovered evidence of three YouTube videos E.L. had recorded and posted in the months before trial that defendant argued "directly impeached [her] testimony that she has anxiety around other people and her testimony that implied that she no longer consumes alcohol."[38] The videos depict E.L. socializing with friends in various settings, drinking, and making numerous references indicating she had been consuming alcohol and doing drugs to excess and/or intended to do so (essentially, partying videos).

Defendant now argues the trial court abused its discretion in denying his request for a new trial on this ground. We conclude that it did not.

" ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328; accord, *People v. McDaniel* (1976) 16 Cal.3d 156, 177 ["clear" abuse of discretion must be shown].) It is unnecessary to address all of the factors required for obtaining a new trial on the basis of newly discovered evidence, because this case founders on the requirement that the evidence claimed to be newly discovered must be " ' "such as to render a different result *probable* on a retrial." ' " (*Delgado,* at p. 328, italics added; accord, *People v. Verdugo* (2010) 50 Cal.4th 263, 308

---

[38] On direct examination when the prosecutor began exploring the general subject of her history with alcohol, she testified in response to a foundational question that she does "[n]ot really" currently drink.

70

[" 'To grant a new trial on the basis of newly discovered evidence, the evidence must make a different result probable on retrial' "].)  The trial court concluded it was not probable that the three videos would have changed the result on a retrial, and this was not " 'manifest[ly] and unmistakab[ly]' " wrong.  (*Delgado*, at p. 328.)

"[T]he claim of newly discovered evidence as a ground for a new trial is uniformly 'looked upon with disfavor,' for there must be an end to litigation." (*People v. Williams* (1962) 57 Cal.2d 263, 274; accord, *People v. McDaniel*, *supra,* 16 Cal.3d at p. 179.)  A different result is probable "when the newly discovered evidence contradicts the strongest evidence introduced against the defendant" and thus a trial court errs if it denies a new trial in such circumstances (*People v. Martinez* (1984) 36 Cal.3d 816, 823; see also *People v. Williams*, at pp. 274-275) but, as the results in countless cases reflect, not when the evidence falls short of doing so.  (Compare, e.g., *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 666-667 [no error in denying new trial on the basis of evidence that would undermine key prosecution witness where there was substantial evidence of guilt apart from her testimony]; *People v. O'Malley* (2016) 62 Cal.4th 944, 1017 [no error in denying new trial on the basis of evidence that would impeach testimony by prosecution witness concerning defendant's whereabouts but that "hardly seems so significant that it would have made a different result more probable on retrial" given other circumstantial evidence of defendant's whereabouts]; *People v. Delgado*, *supra,* 5 Cal.4th at p. 329 [no error in denying new trial sought on the basis of new third-party confession to child murder by witness of dubious credibility, where two percipient witnesses implicated defendant as the killer]; *People v. Hall* (2010) 187 Cal.App.4th 282, 297-301 [no error to deny

71

new trial sought on the basis of new evidence offered primarily to impeach a portion, but not all, of expert witness's testimony, and there was "[o]verwhelming" other evidence of guilt] with *Martinez*, at pp. 822-823 [error to deny new trial where newly discovered evidence "reopen[ed] the critical gap" in the prosecution's case by providing a "credible alternative explanation" for defendant's palm print, which was the sole evidence linking him to the crime].) Indeed, "[a]s a general rule, 'evidence which merely impeaches a witness is not significant enough to make a different result probable . . . .' " (*People v. Green* (1982) 130 Cal.App.3d 1, 11.)

Defendant concedes that "a court may not abuse its discretion for denying a motion for new trial based on newly discovered evidence that shows that a witness is a liar." But he maintains that here, the videos were "not merely impeachment [evidence] but instead *destroyed the prosecution's theory of the case*" (italics added), which was that E.L.'s "behavior following the incident was consistent with that of someone truly raped." We do not agree.

Even assuming the videos would have impeached E.L.'s testimony about her current drinking habits and/or the anxiety she now suffers from (the trial court found they would *not* do so in any material way), they would not have "destroyed" the prosecution's case (or even E.L.'s credibility) unlike in the authorities defendant cites.[39] Defendant's premise is mistaken, and

---

[39] The situation is not at all comparable to the kind or quantum of newly discovered evidence involved in *People v. Randle* (1982) 130 Cal.App.3d 286, a "she-said, he-said" sexual assault case involving an allegedly violent, non-consensual encounter in the bathroom of a public bar that was a concededly close case with the evidence "finely balanced" on both sides, where the newly discovered evidence—20 declarations by 17 different people attesting to the complaining witness's history of dishonesty, public sex acts

vastly oversimplifies the prosecution's case. True, E.L.'s testimony about her social anxiety corroborated her claims about what had befallen her and, indeed, the prosecution made that very point in closing argument. But her credibility concerning that relatively collateral factual issue was not "central to the proof of the crime." (*People v. Randle*, *supra*, 130 Cal.App.3d at p. 293.) (Indeed, it was not even the only evidence of corroborating trauma; she also testified she had changed bedrooms and dropped out of school.) The trauma she suffered afterwards was by no means the prosecution's "strongest" (or indeed only) evidence of guilt. Nor was her very brief testimony that she does "[n]ot really" currently drink (which was even less important, never mentioned by either party in closing argument and not even offered for any corroborating purpose (see footnote 38, *ante*, page 70)). As we have discussed, the prosecution's case rested on a wealth of other more direct evidence, including the uncontradicted testimony of three percipient witnesses to E.L.'s highly impaired condition at the time she arrived home, expert testimony about the kinds of cognitive impairments she would have experienced given her level of intoxication, E.L.'s unexplained bruising, the

and similar matters—"tend[ed] to destroy [the complaining witness's] credibility by raising grave doubts about her veracity and credibility." (*Randle*, at pp. 293, 294 [reversing denial of new trial].)

Also inapposite is *People v. Huskins* (1966) 245 Cal.App.2d 859, an "exceptional case[] with unusual facts" (*id*. at p. 864) where there was newly discovered evidence that the main witness in a child sex abuse prosecution had made similar unproved charges in the past against someone else and also had been hospitalized for mental illness. (*Id*. at pp. 861-862; see also *People v. Green*, *supra*, 130 Cal.App.3d at p. 11 ["in the case before us, the alleged newly discovered evidence does not remotely approach the damaging level of that which was involved in *Huskins*"].)

implausibility of her having sex *willingly* in such close physical proximity to her entire immediate family, and the obvious and compelling fact that, as defense counsel put it in closing argument, "[n]obody *in their sober mind* would want to have sex with their second cousin." (Italics added.)

In these circumstances, we find no clear abuse of discretion in the trial court's conclusion that it was not probable the videos depicting E.L. continuing to drink and socialize in groups would have yielded a different result. It therefore did not err in denying defendant's new trial motion.

## IV.

### *Discharge of a Juror for Refusing to Follow the Law*

Finally, defendant argues the court erroneously excused a juror during deliberations in violation of his constitutional rights. He asserts the trial court erred in doing so because the juror "merely harbored doubt as to [defendant's] guilt" but did not refuse to follow the law. We do not agree, and conclude there was no abuse of discretion.

### A.     Background

About one and a half days into the jury's deliberations, Juror Number 1 sent the court a note stating that "Although I took the oath to apply the law as the charges are written, *I cannot*" (italics added), followed by a lengthy explanation that is accurately quoted in the opening brief and will be discussed as relevant below. The court, with counsel and defendant present, then conducted a lengthy colloquy with the juror, also accurately quoted in the opening brief, in an effort to ascertain whether the juror was refusing to follow the law. After the juror answered the court's questions, and over defense counsel's objection, the court discharged him. The court observed that, "My take on him is that if he were to follow the Court's instructions he

74

would vote guilty. That's my take on him. Whether that's accurate or not I don't know. But I think in view of all the circumstances I have no choice but to discharge him."

The stated basis for the court's ruling was its citation to *People v. Williams* (2001) 25 Cal.4th 441 (*Williams*), Supreme Court authority where a juror in a rape prosecution was discharged for refusing to follow the law, after defense counsel in closing argument had expressly urged the jury to nullify the law. (See *id.* at pp. 445-447.) We have previously described that case: "In *Williams*, the defendant was charged with multiple crimes, including unlawful sexual intercourse with a minor as lesser included offenses to the charges of rape. . . . On the first day of deliberation, the foreperson sent a message to the trial court that a juror refused to adhere to the trial court's instruction on statutory rape because he believed the law is 'wrong.' [Citation.] The juror in question then told the trial court that he was not willing to follow the judge's instruction on this charge because he did not believe statutory rape should be a crime (although he would follow the other instructions for the rest of the charges) and that he was not willing to follow his oath as a juror. Not surprisingly, this juror was discharged. In affirming the judgment, the Supreme Court reaffirmed the 'basic rule' that a juror must determine facts and render a verdict in accordance with the trial court's instructions, and failure to do so constitutes failure to perform one's duty as a juror under Penal Code section 1089. ([*Williams*,] at p. 463.)" (*People v. Salinas-Jacobo* (2019) 33 Cal.App.5th 760, 781.)

## B. Analysis

Section 1089 states in relevant part that "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill,

or upon other good cause shown to the court is found unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of the alternate . . . ." "A juror who refuses to follow the court's instructions is 'unable to perform his duty' within the meaning of Penal Code section 1089." (*Williams*, *supra*, 25 Cal.4th at p. 448.)

A trial court's determination to discharge a juror is reviewed for abuse of discretion, but "a juror's inability to perform as a juror must ' "appear in the record as a demonstrable reality." ' " (*Williams*, *supra*, 25 Cal.4th at p. 448.) "Under the demonstrable reality standard, we must do more ' "than simply determining whether any substantial evidence in the record supports the trial court's decision." [Citation.] "A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question. Once such evidence is found, the substantial evidence test is satisfied. . . . [¶] The demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [good cause for removing the juror is] established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied. [¶] In reaching that conclusion, the reviewing panel will consider not just the evidence itself, but also the record of reasons the court provides."

76

[Citation.]' " (*People v. Salinas-Jacobo, supra*, 33 Cal.App.5th at p. 776, quoting *People v. Armstrong* (2016) 1 Cal.5th 432, 450-451.)

Applying this heightened standard of review, and based on the record as a whole including the court's stated reasons, we conclude the trial court did not abuse its discretion in discharging Juror Number 1 because his inability to perform his duty as a juror appears in the record as a demonstrable reality.

*Williams* is almost directly on point. In *Williams* where, as noted, the Supreme Court upheld a juror's discharge, the Court held the juror's inability to perform his duties appeared in the record as a "demonstrable reality" because "[t]he juror stated that he objected to the law concerning unlawful sexual intercourse and expressly confirmed that he was unwilling to abide by his oath to follow the court's instructions." (*Williams, supra,* 25 Cal.4th at p. 461.) The same is true here.

Just as in *Williams*, Juror Number 1 made clear he thought the law was wrong (*Williams, supra,* 25 Cal.4th at p. 461), and he did so repeatedly—both expressly and in overall substance. His note stated he could not "apply the law as the charges are written" because "I don't believe some of the charges are valid and I can't see my way past this," and he said the conundrum made it "especially not fair *to* . . . [*E.L.*]" (italics added), thus implying he viewed the evidence as pointing toward guilt. He expressed concern that "the intoxication charges as defined" "could" apply to "hundreds of sex acts in the city every day" and, indeed, "could have" applied even to *himself* "at some point" in his own life "and I certainly don't consider myself a rapist." His note expressed similar concerns about "the lessor [*sic*] charges of Assault and Battery," which he wrote "seem so narrowly defined that how

77

can the verdict *not* be guilty?" (Italics added.) Yet, he explained in substance that it also seemed extreme and unreasonable to treat those acts as a criminal offense, writing: "[a]s we walk the streets of San Francisco and ride on public transportation, aren't we subjected to rude, unwanted, forced contact all the time? And maybe some even for sexual gratification. In this case was it rude, offensive, piggish, stupid, idiotic? Yes. But assault? Battery? [¶] *I must be completely out of tune with 2019 law* interpretation." (Italics added.) Toward the end of his note he added that "rendering a not guilty vote" would not be "fair" to E.L., implying for a second time that he believed the prosecution *had* proved its case under the law. When questioned by the court, he again repeatedly implied he disagreed with the law and expressed a strong moral objection to sitting in judgment of defendant.[40]

Just as in *Williams*, Juror Number 1 also confirmed (repeatedly) that he was not willing to abide by his oath to follow the law (see *Williams*, *supra,* 25 Cal.4th at p. 461.) He said so twice in his note: in the very first sentence ("Although I took the oath to apply as written, I cannot") *and* the last ("I feel awful about not upholding the oath"). And he said so at least three times orally when questioned: in response to the very first question put to him,[41]

---

[40] When questioned, he again expressed concern that the rape charges could have equally applied to himself (or his wife) over the years and then commented, "and I certainly don't consider myself a rapist" and he told the court for that reason, "I can't be fair. I can't judge someone else." He also commented, "*I can't see this as even a problem.* Not that it's not a problem. It's not good, but I just—*to, you know, make somebody guilty of a crime,* I just . . . ." (Italics added.)

[41] "THE COURT: . . . . So are you saying that you are refusing to follow the law that the Court has instructed you on? [¶] JUROR NO. 1: Yes."

later on after additional discussion,[42] and again in response to the court's final question ("THE COURT:  So, to be clear, you cannot follow the law on any of the charges? [¶] JUROR NO. 1:  That's right").

The record also clearly reflects that the trial court discharged the juror for refusing to follow the law, and we do not understand the defendant to contend otherwise.  Before the court questioned the juror, it told the lawyers that its purpose in doing so would be to determine "if he won't follow the law as the Court has given it to him"; and then afterwards, the trial court specifically cited *Williams* as the basis for its decision to discharge Juror Number 1.

In sum, this record does not show that Juror Number 1 "merely harbored doubt as to [defendant's] guilt."  On the contrary, the juror repeatedly implied that, under the instructions, he would be required to convict defendant.  And he told the court expressly that because the charges were not, in his mind, "valid," he could not follow the law.  *Williams* is controlling, and defendant's attempt to distinguish it in his reply brief is unpersuasive.  The trial court did not abuse its discretion in discharging Juror Number 1 for refusing to follow the law.  (See *People v. Jo* (2017) 15 Cal.App.5th 1128, 1180 [upholding discharge of juror who indicated she

---

[42] "THE COURT:  Are you telling me you can't abide by that oath [you took at the beginning of the case to follow the court's instructions]? [¶] JUROR NO. 1:  Well, I think that's exactly what I said there.  I just don't think I can.  That's all.  I feel awful about it.  You want me to take those charges and judge them fairly and honestly and I don't think I can.  And I said I would.  Now I'm saying I can't. . . . [¶] . . . [¶] [T]o be fair I have to apply the law . . . as the charges are written and if I can't do that then it's not fair. . . .  That's what I meant by that."

could not morally render a decision, the law was unjust, and she could not follow the law as instructed].)

Since the trial court did not abuse its discretion in discharging Juror Number 1, we necessarily reject defendant's corollary claim (asserted principally in an argument heading but undeveloped in the briefing) that removal of the juror violated his federal constitutional rights. (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 ["[R]ejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none"].)

## V.

### *Cumulative Error*

Defendant argues that his conviction should be reversed because he was cumulatively prejudiced by all of the errors he has raised, even if none are themselves singularly prejudicial.

Because we have rejected every claim of error but one (that is, the admission of Smith's expert testimony about post-rape symptoms of trauma), there is "nothing to cumulate" on top of that error. (*People v. Duff* (2014) 58 Cal.4th 527, 562; see also *Lapenias*, *supra,* 67 Cal.App.5th 162, 181 ["given that we have only found one error, and we did not find that error to be prejudicial, the doctrine of cumulative prejudice does not apply"].)

Further, the cumulative impact of all of the alleged errors, even if we agreed with them all, did not deprive defendant of a fair trial or infringe on any of his state or federal constitutional rights. We have concluded that two were harmless beyond a reasonable doubt (i.e., the alleged instructional

80

errors) (see, e.g., *People v. Wrest* (1992) 3 Cal.4th 1088, 1111 [addressing cumulative prejudice]), and the remaining ones do not collectively undermine our confidence in the jury's verdict by making it "reasonably probable that the jury would not have convicted appellant of the charged offenses" (*People v. Cardenas* (1982) 31 Cal.3d 897, 907), or even reasonably possible the jury would not have done so. (See, e.g., *Clotfelter*, *supra*, 65 Cal.App.5th 30, 68.) The prosecution's evidence was strong. Dr. Smith's challenged testimony was, overall, not central to the prosecution's case and in many respects not even very remarkable (such as her testimony about alcohol and rape, for example, or a rape victim's inclination to acquiesce in certain situations). The nature of the other evidence in question (i.e., the newly discovered videos) at most pertains to collateral factual issues as to whether E.L. downplayed her current drinking habits at trial and/or embellished the extent to which she presently suffers from social anxiety, neither one of which detracts from the prosecution's compelling evidence—through other witnesses—of her condition shortly before the first assault. The juror who was discharged, as noted, strongly implied (repeatedly) he thought the law as stated in the instructions compelled a *conviction*. And after he was discharged the newly constituted jury deliberated for a relatively short period of time (one day) in returning its verdict. Furthermore, the jury asked no questions during any of its deliberations (including before the first juror was discharged), and its only requested readback was of E.L.'s testimony about the second incident in the morning, thus giving no outward sign that it had any difficulty reaching a verdict on the felony charges stemming from the night before. For these additional reasons, we reject defendant's contention of cumulative prejudice.

## VI.

### *Discovery of E.L.'s College Records*

Finally, defendant asks us to review in camera documents that he subpoenaed post-trial from E.L.'s university which the trial court never allowed him to view, which he argued below could potentially discredit her testimony that she dropped out of college due to the impact of the sexual assault.  He had sought the records in order to evaluate them for possible use as newly discovered evidence in support of his new trial motion, but after the school's custodian of records delivered them to the court, the trial court reviewed them in camera and then granted the prosecution's motion to quash the defense subpoena on the ground that the school records were irrelevant, because they "do not support the defense's position that [E.L.] lied" in her testimony about leaving school due to the incident (declining to elaborate further, citing E.L.'s right to privacy).  The records presently remain under seal in this court, as part of the augmented appellate record.

Defendant does not take issue with the trial court's ruling that E.L. has a privacy right in her school records, a question that was briefed below and is unnecessary to address.  He argues only that if there is discoverable information that had a reasonable probability of changing the outcome of the trial, the judgment should be either reversed, or at a minimum, conditionally remanded to enable defense counsel to evaluate the evidence in order to demonstrate prejudice sufficient to warrant the granting of a new trial.

The People do not object to our independently reviewing the sealed records, and we have done so.  The sealed records do not impeach E.L.'s trial testimony but, on the contrary, corroborate it.  Accordingly, as in the authority cited by defendant, because these concededly confidential records

82

are irrelevant and could not have assisted the defense, there was no abuse of discretion by the trial court in declining to allow defense counsel to inspect them. (See *People v. Ramos* (2004) 34 Cal.4th 494, 527 [journalist's notes protected by reporter's shield law]; *People v. Mooc* (2001) 26 Cal.4th 1216, 1232 [police personnel file]; *People v. Samayoa* (1997) 15 Cal.4th 795, 827 [same].) Alternatively, any error in allowing defense counsel to view the records was harmless. For the same reasons, we also now deny defendant's motion to unseal those records, which we previously took under submission.

Defendant also asks us to determine whether all responsive records were produced. Although it does not appear he asked the trial court to do the same, we conclude the records are complete. There are no obvious omissions, and the records are accompanied by a sworn declaration from the custodian of records attesting that they are "true copies of all the records requested."

## DISPOSITION

The judgment is affirmed.

83

_____
STEWART, J.

I concur.

_____
MILLER, J.

I concur in the result.

RICHMAN, Acting P.J.

*People v. Fonseca* (A159178)